377. Defendant's lawyers, Lazega and Johanson, have personally profited by such laws by establishing their own firm and soliciting the clients of their prior law firm by offering them more aggressive collection techniques as the ones they created to harass, abuse, and intimidate the Plaintiff.

378. Even when foreclosure factory lawyers and law firms like Lezaga, and Johanson have full knowledge of their client's wrongdoing, they assist their clients, such as Defendants, in developing schemes, frauds, and abuses to cover-up and conceal the unlawful, illegal, and even criminal behavior.

379. They also coach such association directors and property managers, free of cost, in the various schemes, as described herein, to make it difficult for homeowners to litigate and resolve their disputes.

380. They direct aggressive and abusive legal action toward homeowners and residents in order to not only retaliate, but to make an example of those who question authority or do not follow their outrageous and unlawful demands.

381. Plaintiff has obtained evidence that shows lawyers from the Defendant's own former law firm, thought Defendants to be out of control.

382. These firms, which handle thousands of collection activities and foreclosures have built factory like legal production systems whereby paralegals, which lack supervision of supervising lawyers, create unlawful demands and aggressively initiate lawsuits that are costly for homeowners to defend and fight and inexpensive for the COA associations and their law firms to carry-out based on the "partnerships" created.

383. In each instance, the law firms bill relatively small fees and often let bills go unpaid for years until the law firm is actually paid out of the extortionate demands.

384. Plaintiff's investigation shows that such was the case in the claims detailed herein.

385. Such a system provides the law firm incentive not to settle claims, but to abuse and misuse the process to inure to their own benefit by profiting from fees and expenses that should have never been billed or assessed and legal actions never taken if disputes were resolved in good faith.

386. Lezaga, and Johanson, also added additional fees via services they charge to OBL ,COAs and homeowners that use firms, vendors, and services that they own, have agency relationships with, or obtain commissions and/or kickbacks from.

387. Defendants and their lawyers, Lezaga, and Johanson, were fully aware of Plaintiff Lavalle's efforts as a consumer and investor advocate who has exposed and caused hundreds of billions in losses, liability, exposure, write-downs, and lawsuits for clients and vendors of Lezaga, and Johanson and their prior law firm WNCW.

388. Plaintiff's Trust and Plaintiff were disputing thousands of dollars in unlawful, unauthorized, fraudulent, and abusive fines, charges, kickbacks, fees, assessments, and other demands by Defendants.

389. In the instant case, despite Defendants knowing that all rightful amounts for COA fees and assessments had been made and despite knowing that they had collected thousands in unlawful fines and fraudulent utility fees from the Plaintiff and his Trust, the Defendants commenced a wrongful foreclosure action on or about May 15, 2007.

390. The motive of Defendants were intended to:

   a. Conceal their bad, unlawful, illegal, and even criminal acts;

   b. Further harass an abuse the Plaintiff and his family;

   c. Make Plaintiff capitulate;

   d. Attack Plaintiff prior to him filing suit;

   e. Deter Plaintiff from filing suit;

   f. Attempt to secure jurisdiction in a favorable venue;

   g. Harass Plaintiff into moving;

   h. Prevent Plaintiff from his constitutional due process and free speech rights.

391. The amount claimed owed in the foreclosure complaint were for the unlawful and wrongfully assessed fees, fines, charges, and expenses that the Trust was disputing and did not owe.

392. The amount claimed in their foreclosure complaint was $7,349.37 as of May 8, 2007 as evidenced in Exhibit 25.

393. Yet, the accounting records provided Plaintiff by Defendants and their records as of the date of filing, May 15, 2007, showed that $4,580.98 was claimed to be owed as shown by Exhibit 26 and Exhibit 27.

394. Included in the amounts sued upon were the fraudulent utility bills that are described herein that were not the legal obligation of the Plaintiff or Trust plus amounts for *water bills that exceed $600 per month for a 1500 sq. foot condo whose water bills were about $15 to $60 prior to Defendants reading the Association's meters.* (emphasis added)

395. When Plaintiff learned of this billing in December of 2007 prior to his departure for Florida, he instant messaged Defendant Grenuk on 12/17/07 (Exhibit 28 ) asking for an explanation of such an outrageous claim whereupon a communication between Defendant Grenuk and Plaintiff ensued as follows:

    a.  Plaintiff: "I didn't get any answers to my questions! Do I have to wait until your depo and will you testify truthfully or lie and perjure yourself?"

    b.  Plaintiff: "Still waiting on all the accounting records and please tell me how we're pciking (sic)up 4% of the building 's utilities at almost $800 a month? Come on Mr. Pres, how about some answers? Why are you all spending almost $100K on legal fees and why the lawsuit with AMS?"

    c.  JGrenuk: "Take your index finger, wiggle it on the thermostat lever, and that should take care of your utility bill problem."

    d.  Plaintiff: "hmm its water moron;" "700 a month for WATER?"

396. Further comments from Grenuk in Exhibit 28 included:

    a. "I am under no obligation to discuss anything with you, and again, your bizarre behavior has made it impossible to deal with you as a normal person. Sorry. The residents voted 160 to 1 for us. We have done nothing wrong, and folks are very pleased with everything going on at the building with the exception of you."

    b. "Every voter that vote cast a vote for me. Think that's close?"

    c. "OK, i have to run along now. We'll be in comunication (sic) with the owner of the unit if necessary. Please pay your county and city taxes. You have yourself a great day."

397. It must be noted, that Plaintiff's home in Boca with a swimming pool, sprinkler system, 2 ½ baths, daily washing, cooking, and three occupants, barely reaches $100.00 per month.

398. It must also be noted that Grenuk stated that "I am under no obligation to discuss anything with you" despite the following facts:

    a. Plaintiff was the entity member designated under GA law and the condo instruments as the person do deal with such association business;

    b. The extortionate utility bill was still in Plaintiff's name, despite years of disputes and complaints;

    c. The Plaintiff had a power of attorney supplied to Grenuk and Defendants and the trustee noticed Grenuk to deal with Plaintiff;

    d. Grenuk had solicited the proxy and vote of Plaintiff in prior years and just weeks before.

399. However, to illustrate the wanton malice and vexatious nature of the Defendants and Grenuk's acts and litigation, the very next day on the 18th of December upon the departure for Florida of the Plaintiff, Defendant Grenuk claimed that this and other e-mails and IMs from Plaintiff were criminal acts of stalking and sought an ex-parte TRO against the Plaintiff stating that Grenuk was fearful for his safety; Plaintiff had no right or consent to contact him; the contact was not for any legitimate purpose or



business reason; the contact was outside of Plaintiff's residence; and the communications was threatening.

400. Yet, nowhere in the IM communication of December 17, 2007 does Grenuk even reference not to contact him; stop contacting him; shows or demonstrates any fear of safety, harassment or intimidation; or that the contact, over a $700 a month water bill in Plaintiff's name, shows that Plaintiff has no legitimate motive to contact him.

401. The foreclosure complaint filed by Defendants against the Trust was on May 15, 2007. Thereafter an amended complaint was filed on July 2, 2007.

402. The amended complaint was the ultimate act of intentional harassment and abuse against the Plaintiff and his elderly and infirmed family, the Pews, who he looks after as their only child.

403. There was only one amendment in the amended complaint, which was the address where such complaint could be served.

404. Despite over fifty warnings not to contact the Plaintiff's family, due to the fact they had no legal responsibility for any demand by the Defendants and the fact that they were elderly and suffering from various mental and physical illnesses, Defendants amended the complaint to serve the Plaintiff's family at their home address in Boca Raton, Florida instead of the trustee for the Trust.

405. The complaint was filed May 15, 2007 and signed by Defendant's lawyer Johanson with the approval and direction of the Defendants against the expressed warnings of the Plaintiff.

406. Yet, the complaint filed on May 15, 2007 and then amended in July of 2007 was not served upon the Plaintiff's Trust until December 3, 2007, over seven months after its original filing and only after learning that Plaintiff intended to file this lawsuit.

407. Despite the fact that Plaintiff was in known possession of the Condo, the Defendants schemed to not include him as a Defendant in the wrongful foreclosure action filed against the Trust, but instead used the fraudulent stalking claims and allegations to have the Plaintiff evicted and barred from his property.



408. The complaint filed was only against the Trust and did not name the Plaintiff, despite placing his and his family's address in their amended complaint.

409. However, the Trust had paid in full to OBL all of the extorted amounts complained of and demanded by the Defendants and Defendants had full and complete knowledge of this fact.

410. Defendants have failed to document and account for all payments made by the Plaintiff's Trust.

411. According to the records of the Merrill Lynch Trust Company, the following payments have been made to Defendants and cover all sums due for the payment of all lawful monthly COA fees and special assessments due.

### SCHEDULE OF PAYMENTS MADE ON ANNUAL BASIS

| Year | Total Amount Paid |
|---|---|
| 2003 | $5,453.15 |
| 2004 | $7,619,68 |
| 2005 | $9,864.08 |
| 2006 | $15,700.34 |
| 2007 | $16,059.08 |
| Total Payments: | $54,696.33 |

412. The following table, based upon the latest transaction history from Defendant's communication from the current President Grenuk shows the maximum amount that is lawfully owed and due to the OBL for Monthly COA fees and lawfully assessed special assessments since ownership of the subject property.

| Monthly COA Fees 3/03 to 12/04 | 22 Payments @ $470.40 | $10,348.80 |
|---|---|---|
| Monthly COA Fees 1/05 to 12/07 | 36 Payments @ $570.00 | $20,520.00 |
| Special Assessment | $9,345.20 | $9,345.20 |
| | TOTAL | $40,214.00 |

413. The disparity in figures and disputes between the parties related to Plaintiff's Trust's account with OBL now exceeds over $20,000.00 that Defendants have extorted or attempted to extort from Plaintiff's Trust and attempted to extort directly from the Plaintiff himself.

414. The Defendant's lawsuit against his Trust was filed in May of 2007 with a verification by OBL that $7,349,37 was owed as of May 8, 2007, a number that is impeached by OBL's own accounting ledger and Transaction History, provided to Plaintiff on or about December 27, 2007.

415. On the date of the filing of their lawsuit, $4,580.98 was claimed to be owed by the Trust, a difference of $2,768.39 which accounts for almost five complete months of future monthly COA fees and the amounts of the unlawful and illegal utility bills that were attempted to be extorted by the Defendants from the Plaintiffs for the past four years!

416. The complaint was served upon the Trust on December 3, 2007 almost seven months after filing and after receipt of over $9000.00 in additional payments.

417. An additional payment of $3,636.44 was made on or about December 27, 2007 *after a demand letter from Defendants (Exhibit 29) dated December 3, 2007 claimed that $3,636.44 was owed and that a foreclosure action, which had already been taken months earlier and served on the same date*, (emphasis added) would be taken if the amount was not paid.

418. The demand letter was also copied to Plaintiff and sent to Florida.

419. On December 15, 2007, Plaintiff confronted Defendant's property manager, Edward Jarrett, at a public party of 5,000 people surrounded by police officers and Marines after Jarrett publicly mocked him at the party by pointing and laughing at Plaintiff.

420. Plaintiff went up to Defendant Jarrett and said "he who laughs first, laughs last" and then informed Defendant Jarrett that he would do everything in his power to rid the building of a racist and bigot like Jarrett and that he would do all in his power to insure that Jarrett would never work for any other property again where he could abuse people, especially disabled and older women."

421. Jarrett then got within inches of Plaintiff's face and began belittling, threatening, and antagonizing Plaintiff until Plaintiff left.

422. Defendant Jarrett, on the same date as Grenuk, made false claims that Plaintiff physically threatened Jarrett's wife when no such threat ever occurred and took out an ex-parte stalking order against Plaintiff.

423. Despite dozens of police officers, security and Marines, Defendant Jarrett nor his wife talked to nor made any report to police or security of such an egregious allegation since no such threat ever occurred.

424. Yet, while in the company of from three to five additional younger and bigger men that Plaintiff, who suffers from a physical disability to his right shoulder, Defendant's Jarrett and Grenuk made at least three police reports to Police against the Plaintiff in his own residence after Plaintiff came into the property office or board room to confront Defendants about their abuse and harassment.

425. Defendants all claimed that such acts, constituted criminal stalking acts by the Plaintiff.

426. Defendant Jarrett then filed, along with Defendant Grenuk, that these individual events along with an e-mail sent immediately to Jarrett after their confrontation were stalking acts against Jarrett and Grenuk.

427. In an ex parte hearing, they claimed that they were in immediate fear for their safety, despite the fact that both Defendants knew that Plaintiff was in Florida for the winter.

428. Such actions made good on the "veiled, implied, and direct threats" by Defendant Jarrett and the Defendants in March and April of 2007, July 4, 2007, and that neighbors and friends had warned the Plaintiff against.

429. Even after filing a foreclosure complaint and the amounts of payments paid in dispute upon the threats of Defendants, the amounts paid by the Trust exceeds $14,000.00 and is far in excess of the amounts complained of in Defendant's complaint.

430. The foreclosure complaint authorized and filed by Defendants was filed with malice and for the sole purpose and intent of harassing and abusing the Plaintiff by the Defendants and to make him move out.

431. Mortgage Electronic Registration Systems ("MERS"), the mortgage holder of Unit #1907 of OBL, was indebted to the Defendant for over $13,000.00 with a mortgage lien of an unknown value placed on the unit and Defendants did not file any foreclosure action against MERS despite the Plaintiff offering the Defendants to have his counsel handle such a foreclosure at no cost to Defendant.

432. In a court hearing on January 4, 2008, Defendant's Grenuk and Jarrett provided perjurious testimony that Plaintiff criminally stalked them via e-mails and personal confrontations that:

   a. Occurred outside the Resident of Plaintiff when all acts took place in the Condominium and neither Jarrett or Grenuk resided in the Condominium;

   b. Despite the legal rights afforded to Plaintiff and the direction by the Defendants to contact them, Plaintiff's contact were without their consent;

   c. Despite the numerous legal disputes; contracts and agreements with each other; bills in Plaintiff's name; collection and demand letters to Plaintiff from Defendants; phone calls and e-mails to Plaintiff asking for money; and other contacts, that the responses and communication from Plaintiff in return to such actions had no legitimate business, legal, or personal purpose; and

   d. Defendants were in fear for their personal safety since Plaintiff had threatened to sue them and do what it took to place them in jail.

433. Due to the perjurious testimony by Defendants Jarrett and Grenuk, under the direction of the other Defendants, a restraining order was issued against Plaintiff barring him from 200 yards of his own property.

434. The order is now subject to several appeals on constitutional and fraud upon the court grounds and is expected to be overturned by supervising and Federal courts.



435. Most recently, the Defendants, without any further contact with Grenuk or Jarrett as ordered by the state court pro hac vice magistrate in Georgia, have sought contempt charges against the Plaintiff seeking to have him criminally prosecuted for a jail sentence of from one to ten years, simply for communicating to other board members, as is his right under GA law, the declaration, the power of attorney and the state and Federal constitutions for informing them of this lawsuit, and still seeking a reasonable settlement by having the board dismiss Defendants Jarrett and Grenuk due to not only the harassment of Plaintiff, but other owners and the Plaintiff's family.

436. New evidence has come forward that conclusively proves beyond any doubt, that the Defendants engaged in a conspiracy to concoct the stalking claims to remove the Plaintiff from his own property in order to keep him from causing additional trouble and uncovering additional victims of the harassment and abuse of the Defendants for a class action lawsuit.

437. The Plaintiff's trust answered the wrongful foreclosure action with a detailed answer and countersuit on January 2, 2008.

438. On or about January 16, 2008 after obtaining the restraining order against the Plaintiff, the Defendants non-suited and dropped their wrongful foreclosure action against the Plaintiff's Trust, since their intention was to instigate and provoke a reaction against the Defendants that they could use to wrongfully remove him from his property, which was the objective of the Defendants.

439. Defendants never noticed of notified the Plaintiff, his trustee or their lawyers of such non-suit and dismissal nor sent them any order to that effect.

440. Most recently, Plaintiff has been working with other aggrieved, elderly, and disabled fellow owners and occupants to bring forth claims against the Defendant for violations of Federal statutes including the Americans With Disabilities Act and the Fair Housing Act.

441. Plaintiff's investigation has discovered the following:

a.  Defendant's harassment of elderly and disabled owners and occupants in order to make them move out;

b.  Defendant's treatment and lack of proper service to African-Americans;

c.  Preventing and discouraging entrance into the building of African-Americans, Hispanics, Asians and the elderly who come to the building seeking to look at purchase and enter the building;

d.  OBL's contemplated purchase of a $1 million penthouse to turn into a sales center operated by Defendant Jarrett in order to "screen" potential owners and renters and screen out members of target minorities;

e.  Defendant's plans to have Defendant Jarrett, who has openly expressed and admitted to having racist and prejudiced views, be the exclusive sales and leasing agent for the Condominium;

f.  Defendants telling real estate agents that they must introduce prospective purchasers and lessors to Defendant Jarrett for screening and approval;

g.  Defendants removing all handicap parking spots from the Condominium.

442.  Most recently the Defendants, despite the warnings of the Plaintiff who is of 100% Latin ancestry as to the liability imposed by their blatant discriminatory actions, have addressed and taken measures described above and herein to promulgate acts against targeted, racial, ethnic, elderly, and disabled groups.

## COUNT ONE: RACKETEERING ACTS IN VIOLATION OF FLA 772.00

443.  Plaintiff repeats and reiterates each allegation contained in paragraphs "1 to 442" as though the same were hereinafter more fully set forth.

444.  Defendants attempted to commit; conspired to commit and solicited and coerced other persons to commit violations of FLA Chapters 815, 817, 836.05 and U.S. 18 U.S.C. s. 1961(1) (A), (B), (C), or (D).

445.  The Defendants operated the "Enterprise" via their individual direction of the Association in concert with other partnerships, corporations, and groups of



individuals and entities through a pattern of criminal activity engaging in at least two incidents of criminal activity and violations of FLA. Chapters 815, 817, and 836.05, that had the same or similar intents, results, accomplices, victims, and methods of commission and are interrelated by distinguishing characteristics and are not isolated incidents that continue to this date in time have all occurred within the past five (5) years.

446. The acts complained of, while directed against the Plaintiff and his Trust from their relationship with the Defendants, were also committed against dozens, if not hundreds of additional members of the Association, owners, and residents of the Condominium.

447. The Defendants, with criminal intent, received the proceeds and directed, through a pattern of criminal activity, the investment of such proceeds into the investment of the enterprise, its books, personal payments and kickbacks and other means of financial gain.

448. The Defendants personally gained by such kickbacks, payments, and investments.

## The Fraudulent Utility Billing Scheme & Enterprise

449. On or before May 10, 2003, OBL began engineering a fraudulent accounting scheme designed to generate additional cash, payments, and cash flow that it was not entitled to.

450. Defendants were fully aware of such schemes and have attempted to conceal such schemes after they became members of the Board of OBL.

451. Prior to May 10, 2004, OBL sent duplicate and/or multiple bills for the same COA fees causing MLTC to automatically pay, on behalf of Plaintiff's Trust, more than two months ahead of the due date for COA fees.

## Defendants' Specific Racketeering Acts

452. The use of the mails (18 U,S,C, §1341) or interstate wire transmissions (18 U.S.C. §1343) (wire fraud) are prohibited in furtherance of "[a]ny scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises..."

453. There is at both common and statutory law, an implied covenant of fair dealing in any contract, including the Declaration of Condominium.

454. The actions of the all of the Defendants in creating, managing, supervising, operating, and furthering the UTILITY OVERBILLING & FRAUDULENT BILLING ENTERPRISE, as alleged herein, to attempt to extort money and property from the Plaintiff and unlawfully capitalize on Plaintiff's Trust's Condo Declaration by (1) attempting to collect illegal fees and charges; (2) attempting to force them into foreclosure in order to profit from the equity in property; and (3) refusing to bargain in good faith about known fraudulent, unlawful and disputed fees for services never rendered, provided and/or obligated by anyone; is a scheme or artifice to defraud as defined by both Sections 1341 and 1343. (the "Utility Fraudulent Scheme").

455. In furtherance of the Utility Fraudulent Scheme, the Defendants caused to be transmitted by means of (1) the mails; (2) overnight delivery service or (3) interstate wire communications, documents including account statements, responses to requests for information, demand letters, invoices, spreadsheets, ledgers, utility bills, all in violation of. §1341 and/or § 1343 which make criminal such the use of mails, overnight delivery service or interstate wire communications in furtherance of a scheme or artifice to defraud.

456. The following Table identifies for each act of mail or wire fraud the Exhibit Letter, the date of the act, the sender/receiver, the method of transmission and a description of the transmission. Where "Wire" is indicated, it means an interstate wire transmission in violation of 8 U.S.C. §1343. Where "Mail" is indicated, it means the use of the mails in violation 18 U.S.C. §1341.

| DATE | SENDER/ RECIPIENT | METHOD | DESCRIPTION |
|---|---|---|---|
| 6/14/06 | OBL/Lavalle & Trust | Mail | Demand Letter Attempting To Extort Over $5000 Than Legally Due |
| 10/24/06 | TRANSWORLD/ MLTC | Mail | Collection Demand to 3rd Party For Debt Not Legally Owed Nor Owed By Lavalle |
| 8/16/06 | WNC&W/ Lavalle, Trust, & Pews | Mail | Notice Of Foreclosure Extorting More Than $4000 Than Legally Due |
| 6/15/06 | OBL/ Lavalle, Trust, Pews, & MLTC | Mail | Financial Transactions With Spoliation Of Data From 8/02 to 5/10/04 Showing Obligation, if any, to be $3664.45 as of June 1, 2006, not $9,645.25 demanded in letter of 6/14/06 |
| 8/30/06 | OBL & WNC&W/Pews, Trust & Lavalle | Mail & Wire | Financial Transactions With Spoliation Of Data From 8/02 to 5/10/04 Showing Obligation, if any, to be $6,112.28 as of August 1, 2006, not $10,345.64 demanded in WNC&W letter of 8/16/06 |
| 9/3/04 | VITERRA, OBL & WNC&W/Lavalle, Pews, Trust & MLTC | Mail & Wire | Communication of private and confidential information on illegal and disputed debt, not owed by Lavalle, as well as fraudulent debt communicated and demanded to be paid by 3rd and non-responsible parties. |
| On Or About 12/8/06 | OBL/ Lavalle | Mail & Wire | Spreadsheet showing unlawful application of extorted sums from Trust. |
| 8/31/06 | WNC&W/ Trust | Mail | Cover Letter For Financial Transactions With Spoliation Of Data From 8/02 to 5/10/04 Showing Obligation, if any, to be $6,112.28 as of August 1, 2006, not $10,345.64 demanded in WNC&W letter of 8/16/06 |
| 10/18/06 | OBL & HMS/ Lavalle | Mail | Invoice for COA fees known to not be legally owed by Lavalle and already paid. |
| 11/20/06 | OBL & HMS/ Lavalle | Mail | Invoice for COA fees known to not be legally owed by Lavalle and already paid. |
| 12/20/06 | OBL/ Lavalle & Trust | Mail & Wire | Minutes of OBL Board showing knowledge of meter fraud scheme. |
| 7/12/06 | OBL/ Lavalle & Trust | Mail & Wire | Minutes of OBL Board showing knowledge of meter fraud scheme. |
| 6/14/06 | OBL/ Lavalle & Trust | Mail & Wire | Minutes of OBL Board showing knowledge of meter fraud scheme. |

| 12/17/05 | OBL/ Lavalle & Trust | Mail & Wire | Minutes of OBL Board showing knowledge of meter fraud scheme. |
|---|---|---|---|

457. By reason of the foregoing, each Defendant indicated violated Section 1341 and/or Section 1343 of Title 18 of the United States Code on more than two occasions to two different persons and entities including over two persons and entities in the state of Florida.

458. By reason of the foregoing, the Defendants participated in the affairs of the UTILITY REBILLING ENTERPRISE through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

### The Fraudulent Fine & Assessment Billing Scheme & Enterprise

459. As described above and described herein, the Defendants against the advice, counsel and evidence provided to the Defendants intentionally and with malice created, approved, and carried out various fraudulent schemes and used extortionate threats against the Plaintiff, his Trust, and other members of the Association to carry out additional frauds using the mails and wire of the United States in violation of Section 1341 and/or Section 1343 of Title 18 of the United States Code on more than two occasions to two different persons and entities.

460. These acts included, but are not limited to the Defendants continuing and expanding a fraudulent billing enterprise by:

    a. Using a formula for utility RUBS square footage use that did not take into account the height of ceilings on the 17th floor that inured to the benefit of Defendants Allen, Reinking and other board members with units on the 17th floor;

    b. After installing electric meters, creating false meter readings and billings for targeted members, owners, and residents that Defendants wanted out of the building by fraudulently increasing their monthly bills from 100% to over 2000% and saving themselves money from their personal utility bills;



c. Charging from $100 to $300 a month fines to the Plaintiff, his Trust and other owners for not installing a water heater that was unlawfully demanded by Defendants to be installed;

d. Continuing to charge the Plaintiff, his Trust, other members, owners and residents a $6.00 per month fee for the reading of meters that employees of OBL took only one hour to do and having the agents of Defendants kickback the $6.00 fee to Defendants;

e. Placing fraudulent fees, meters readings, utility usage and other costs into computer systems that generated fraudulent bills and invoices that were mailed into the state of Florida, county of Palm Beach;

f. Unlawful fines created, approved and demanded by the Defendants and the Association;

g. Unlawful assessment of late fees, interest and other financial engineering schemes to extort additional income, money and revenue from the Plaintiff, his Trust and other owners that there was no legal basis for; and

h. Commencing wrongful and unlawful foreclosure actions using perjurious affidavits claiming amounts not legally owed that were directed toward the state of Florida.

## Violations Of FLA 815.02

461. As described above and herein, Defendants created, implemented, concealed, carried out, protected and furthered various billing, accounting, and utility frauds, schemes, and scams utilizing the United States mail and wires.

462. In addition to using the United States mail and wires to create, implement, conceal, carry out, protect and further the described frauds, each of the fraudulent schemes and scam extensively used computers, computer systems, and programs in and outside the state of Florida with the intended harm being created in Florida and targeting Florida consumers, including the Plaintiffs.

463. Defendants, in violation of the legislative intent of FLA 815.02 *introduced fraudulent records into a computer system* (emphasis added) as well as computer networks and programs as described above and herein.

464. Defendant Does, Roes, and Corporate Roes 1 to 6 intentionally, willfully, knowingly, and without authorization destroyed accounting and billing data related to the Condo's and Trust's account as well as other Owners an Residents of OBL.

465. Defendants were fully aware of such destruction.

466. Defendants also intentionally introduced false and fraudulent data, information, credits, debits, formulas, ratios, equations, and calculations into various accounting and billing systems as described herein and above in an effort to fraudulently induce:

    a. Payments not legally owed or obligated to by the Plaintiff, his Trust and others;

    b. Secure advance payments for services never delivered or to be delivered later;

    c. Payments in excess of the Plaintiff's or his Trust's legal obligation, if any;

    d. Payments concealed and used as kickbacks;

    e. Payments of fees, fines, charges, expenses, and assessments not legally or lawfully assessed or owed.

467. The Defendants created and committed the offenses described herein and above for the purpose of devising and executing various schemes and artifices to defraud and obtain money and property of the Plaintiffs the Defendants were warned and noticed that the such actions were violations of law.

## Conspiracy

468. Each of the Defendants conspired to violate 18 U.S.C. §1962(c) with each other in order to effectuate the Utility Billing Fraudulent Scheme and each of the

racketeering acts set forth above constituted an overt act in furtherance of that conspiracy.

469. By reason of the premises aforesaid, each and every Defendant has individually and severally violated 18 U.S.C. §1962(d).

### Damages

470. By reason of the foregoing violations of 18 U.S.C. § 1962(c) and § 1962(d), the Plaintiff suffered damages in such amount as may be determined by a jury but at least in the amount of $2,500,000.00.

471. Defendant's offenses are ongoing and it can be reasonably anticipated that future damage may result.

472. WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages in the sum of at least $2,500,000.00 that are within this Court's jurisdictional limits and he prays that:

   a. The amount of said damages, according to FLA 772.00 that are found by the Jury be trebled;

   b. All assessment of fines for water heaters; fines without due process notice; money paid to homeowners for balconies that were not painted; all money paid by homeowners for their water heaters; all unlawful late fees be disgorged and returned to the Plaintiff, his Trust and other homeowners by being deposited into the registry of this court;

   c. Extreme punitive damages in the amount of at least $25,000,000.00 or whatever figure a reasonable jury may decide, be awarded as a matter of public policy and a statement to the public that COA and HOA abuse will not be tolerated in the state of Florida or this nation;

   d. Reasonable attorney's fees and court costs in the trial and appellate courts be awarded.

## COUNT TWO: VIOLATIONS OF FLA 559.72 CONSUMER COLLECTION PRACTICES

473. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "472" with the same force and effect as though the same were hereinafter more completely set forth.

474. Plaintiff is a "consumer" and "debtor" as defined by FLA 559.55 (2)

475. OBL is a "creditor" as defined by FLA 559.55 (3)

476. Each Defendant was attempting to collect a "debt" and "consumer debt" which was an *alleged obligation* (emphasis added) of the Plaintiff as defined by FLA 559.55 (1).

477. The "debt" and "consumer debt" which was an *alleged obligation* (emphasis added) of the Plaintiff each Defendant was attempting to collect was meant for another "Debtor."

478. Each Defendant attempting to collect a "debt" and "consumer debt" which was an *alleged obligation* (emphasis added) of the Plaintiff as defined by FLA 559.55 (1) directed "communications" to the Plaintiff as defined by FLA 559.55 (5).

479. Defendants violated FLA. 559.72 (2) in that Defendants threatened force and violence against the Plaintiff.

480. Defendants violated FLA. 559.72 (3), (5), (6), (7), (9), (14), (17) and (19) by having knowledge of the following facts and/or committing the following acts:

    a. Plaintiff had no legal responsibility for any obligation to OBL or Defendants;

    b. Defendants intentionally defamed and informed others via written communications, e-mails, and voice that Plaintiff had not paid his obligations to Defendants and OBL;

    c. Defendants had full and complete knowledge that the Plaintiff disputed all debts and obligations to OBL;

d. Defendants had full and complete knowledge that the Plaintiff's Trust disputed the debts and obligations they had to OBL;

e. Defendants intentionally, maliciously, unlawfully and wrongfully informed others throughout the United States and Florida that Plaintiff was indebted to OBL;

f. Defendants did not communicate to anyone that the Plaintiff was disputing any legal obligation to OBL as well as any amounts claimed owed and due;

g. Defendants did not communicate to anyone that the Plaintiff's Trust was disputing substantial amounts claimed owed and due;

h. Defendants did not communicate to anyone that the Plaintiff was disputing any legal obligation to OBL as well as any amounts claimed owed and due;

i. Defendants did not communicate to anyone that the Plaintiff and his Trust were disputing substantial amounts claimed owed and due that neither had any obligation for;

j. Such communication had no legitimate business purpose other than to discredit, defame, harass, and harm the Plaintiff's reputation;

k. Such communications did harm the reputations of the Plaintiff;

l. Defendants knew the information was false;

m. Defendants in a civil conspiracy with others, directed intentional harassment, intimidation, threats, abuse, and otherwise intentionally inflicted emotional distress upon Plaintiff and his family, Anthony and Matilde Pew who were elderly and infirmed in retaliation for Plaintiff's and the Trust's disputes of the debts claimed owed and Plaintiff's discovery of the Enterprise

n. Defendants unlawfully contributed to the disconnection of the telephone service of Plaintiff whereby valuable and necessary 911 service and business telephone service was disconnected;

o. Defendants unlawfully contributed to a concocted and fraudulent scheme to unlawfully evict Plaintiff from his Condo and residence;

p. Defendants from 2004 to July of 2007 continued to claim, attempt to collect, and threaten to collect a debt from Plaintiff, bills, invoices, fees, and charges that Plaintiff had no legal responsibility or obligation for and that were for a fraudulent bill with fake meter readings;

q. The debts claimed owed by Defendants from 2004 to July of 2007 were not legitimate; were created by fraudulent pretenses; and were not the legal obligation of Plaintiff;

r. Defendants published and threatened to publish a "deadbeats list" naming Plaintiff for the purpose of harassment, defamation, and in an effort to coerce and extort payments from the Plaintiff and his Trust that were unlawful, illegal, and not legally obligated for by either the Plaintiff or his Trust.

s. Defendant's agent and president communicated with Plaintiff's family between the hours of 9:00 PM and 8:00 AM EST despite Plaintiff's notice to OBL not to contact the Pews.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT THREE: VIOLATIONS OF FLA 817.061 MISLEADING SOLICITATION OF PAYMENTS

481. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "480" with the same force and effect as though the same were hereinafter more completely set forth.



482. From January 1, 2002 to July 31, 2007, Defendants sent statements, invoices, and demands for payments for services never performed or delivered to the Plaintiff.

483. Defendants had full and complete knowledge that the bills and invoices were for services never performed or delivered.

484. Defendants have admitted that such bills were for services never provided to the Plaintiff, yet have still attempted to collect for such bills and invoices

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT FOUR: VIOLATIONS OF FLA DECEPTIVE & UNFAIR TRADE PRACTICES ACT

485. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "484" with the same force and effect as though the same were hereinafter more completely set forth.

486. Section 501.204(1), Florida Statutes, provides that "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

487. As set forth herein, Defendants, acting individually and in concert with others, have engaged in representations, acts, practices or omissions in trade or commerce which are material and which were likely to mislead consumers acting reasonably under the circumstances; and

488. Defendants have engaged in acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.

489. By engaging in the foregoing, Defendant have engaged in deceptive and unfair trade practices in violation of Section 501.204, Florida Statutes.

490. Defendants knew or should have known that the methods, acts or practices alleged herein were deceptive or unfair.

491. Defendants were warned that schemes, acts or practices alleged herein were deceptive and unfair.

492. The actions as set forth above and herein are violation of FLA. 501.204 (1) and (2).

493. Plaintiff is a "consumer" and "interested party" as defined by FLA. 501.203 (6) and (7).

494. The collection acts, harassment, abuse, and fraudulent billing and allocations schemes directed toward the Plaintiff by the Defendants described herein were and are unconscionable, deceptive and unfair business and trade practices that have been transacted in interstate and intrastate commerce as defined by FLA. 501.203 (8).

495. Such acts and representations made by the Defendants to Plaintiffs are in violation of the FDCPA, 15 U.S.C. § 1692e as well as FLA. 501.204 (1) and (2).

496. There were other misrepresentations and violations of the FDCPA and FLA. 501.204 (1) and (2) that will be specified during discovery by each of the Defendants.

497. The harassment, abuse, threats, fraudulent billing acts, kickbacks, and conspiracy to evict Plaintiff from the Condo via perjured testimony and false affidavits as well as the wrongful foreclosure instituted by the Defendants and supported by perjured verifications are unconscionable acts.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT FIVE: COMMON LAW FRAUD

498. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "497" with the same force and effect as though the same were hereinafter more completely set forth.

499. Defendants made numerous representations to Plaintiff as to the amount, character, nature and responsibility for debts.

500. Defendants made numerous representations to Plaintiff as to the amount, character, nature of utilities used.

501. The Defendants knew that the representations of debt and amounts of utilities used were indeed fabricated and false and intended to deceive and defraud the Plaintiff.

502. The Plaintiff believed and justifiably relied upon the statements of the Defendants and due to Plaintiff's conduct and reliance suffered pecuniary loss.

503. The actions of the Defendants alleged aforesaid, constitute common law fraud in which each and every Defendant is a joint tortfeasor.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT SIX: DEFAMATION, SLANDER & LIBEL

504. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "503" with the same force and effect as though the same were hereinafter more completely set forth.

505. Defendant's conduct was extreme and outrageous and involves a continuing pattern of defamation, slander, and libel for over two years.

506. Defendants have provided written, electronic, and verbal communications to third parties in business relationships with the Plaintiff Lavalle, his Trustees, Trust, other beneficiaries, residents and owners of the condominium, and members of Plaintiff's community that:

    a. Plaintiff Lavalle suffers from Bi-Polar disease which is a false, defamatory, slanderous, and libelous;

    b. Plaintiff Lavalle was legally obligated to the Defendant OBL for past due and delinquent COA assessments, fees, utility bills and other fraudulent claims when Lavalle had no such liability, obligation or duty to the Defendant OBL and Defendants;



   c.  Defendants published Plaintiff's name on a deadbeats list and distributed it to owners and other non-parties to intentionally defame and damage Plaintiff when he had no personal obligation to the Defendants;

   d.  Plaintiff Lavalle physically threatened, stalked, and placed Defendants in physical fear for their safety;

   e.  Plaintiff Lavalle was banned from his building and would be arrested if he entered his building in July of 2007; and

   f.  Plaintiff Lavalle suffered from a variety of mental illnesses and his allegations against the Defendants were false.

507. The slanderous, defamatory, and libelous conduct and actions of the Defendants were designed to damage Plaintiff Lavalle's reputation, image, and credibility among his community and the Condominium where others are influenced by Plaintiff.

508. The slanderous, defamatory, and libelous conduct and actions of the Defendants were and did damage Plaintiff's reputation, image, and credibility amongst his neighbors, community and friends and have caused humiliation, angst, anger, frustration, loss of credibility, reputation, friends, and business.

509. The Plaintiff has lost business and business opportunities and been threatened with suit by a client due to his inability to perform his duties due to the Defendant's actions.

510. The slanderous, defamatory, and libelous conduct and actions of the Defendants were done with malice in an effort to discredit Plaintiff and his allegations of wrongdoing and criminal conduct by the Defendants.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT SEVEN: CONVERSION & UNJUST ENRICHMENT

511. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "510" with the same force and effect as though the same were hereinafter more completely set forth.

512. Defendant's actions, conspiracy and willful interference with Plaintiff's Lavalle's possession of the Condo and enjoyment therein constitutes an act of conversion by the Defendants.

513. As described above, from February of 2007 to the present date, Defendants conspired with one another in an effort to unlawfully and wrongfully evict Plaintiff Lavalle from the Condo and his residence due to his exposure of wrongdoing and unlawful conduct of the Defendants.

514. Defendants were successful in their effort when they hatched a plan to harass, intimidate and abuse Plaintiff as described above to provoke a reaction to their harassment whereby Defendants would then claim that the reactions of Plaintiff in disputing and confronting Defendants for their acts were acts of stalking which Defendant's Grenuk and Jarrett instituted against Plaintiff.

515. Whereas, Plaintiff has been deprived of his right to possession of his property.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT EIGHT: INVASION OF PRIVACY

516. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "515" with the same force and effect as though the same were hereinafter more completely set forth.

517. OBL Board Defendants managed and oversaw the Internet service of the Condominium.

518. Defendants did use their dominion over the Internet service, to not only disrupt such service, but to electronically spy, tap into, and monitor Plaintiff's use, traffic, and navigation of the Internet and intercept communications from Plaintiff Lavalle.

519. Furthermore, Defendants placed Plaintiff under surveillance and had employees videotape Plaintiff's coming and going and who he associated with.

520. Defendants also harassed other owners who Plaintiff was working with to expose the actions of the Defendants,

521. Defendants, despite prior warnings about such access by others, refused to take the necessary and requisite steps to protect the Plaintiff and other owners and residents of the Condominium to prevent the unlawful access and spying of Internet use by the Plaintiff and others so that Defendants could keep tabs on the actions of Plaintiff and other residents who opposed Defendants actions in the Condominium.

522. Such actions constitute an invasion of rightful privacy and intrusion upon seclusion of Plaintiff Lavalle when the Defendants intentionally intruded via electronic means upon the private space, solitude, and seclusion of Plaintiff and his private affairs.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT NINE: TRESPASS, BREAKING & ENTERING

523. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "522" with the same force and effect as though the same were hereinafter more completely set forth.

524. Defendants threatened to re-key and enter the storage units of Plaintiff via various communications.

525. Defendants were warned not to enter or disturb the storage unit of Plaintiff and any such act would be considered trespass and breaking and entering.

526. Despite such warnings, Defendants broke into and entered the Plaintiff's storage unit leased from Defendant Grenuk and re-keyed the locks of the storage unit and refused to provide a new key or access to the unit for which payment had been made.

527. Furthermore, Defendant Grenuk violated the terms of the agreement he reached with Plaintiff Lavalle and harassed the Plaintiff and his family via phone calls and emails threatening to throw their property in the trash, against state law and without court order, if they refused to remove their property from the unit.

528. The actions of the Defendants constitute trespass and breaking and entering to which the Plaintiff has suffered damages.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT TEN: ABUSIVE & VEXTIOUS LITIGATION & ABUSE OF PROCESS

529. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "528" with the same force and effect as though the same were hereinafter more completely set forth.

530. On May 15, Defendants filed a Complaint for Foreclosure upon the Plaintiff's Trust for amounts not legally owed or obligated to and in which all claimed amounts had been paid.

531. The Foreclosure Complaint filed by the Defendants was supported by a verification by Defendant Jarrett in which the claimed wrongful indebtedness was contradicted by over $2800.00 by the Defendant's own accounting records.

532. The Foreclosure Complaint was not served within the required legal timeframe and in the interim, the Defendants further demanded and collected under additional extortive threats, over $12,000.00 in additional payments that were income to the Plaintiff, as described above, and did not amend or withdraw its Complaint for Foreclosure.



533. The Complaint for Foreclosure was served upon the Plaintiff's Trust on December 3, 2007, a full six months after it's filing and only after Defendants learned that the Plaintiffs would be initiating this suit.

534. Plaintiff's Trust has paid all disputed amounts claimed owed.

535. Upon receiving word of the Defendant's wrongful acts, Plaintiff Lavalle began preparation of affirmative defenses and counterclaims to be exerted by the Trust against Defendant OBL.

536. Defendants, despite knowing that Plaintiffs resided in the Condo and had possessory interests in the Condo, did not serve or include the Plaintiff as a defendant in its suit for foreclosure.

537. On or about the 15th of December, 2007, Plaintiff Lavalle attended the annual Toys-For-Tots charity gala with friends.

538. This was the fourth year in a row Lavalle has attended the event.

539. Defendant Jarrett testified that this was the first Toys-For-Tots event he attended and informed others to place Plaintiff under surveillance and that he knew what parties Plaintiff would attend.

540. At the event, Lavalle saw Jarrett in attendance when he walked by him on several occasions and ignored his presence, despite the fact that Jarrett had just wrongfully served the foreclosure suit upon Plaintiff's trust for a wrongful foreclosure.

541. However, later in the evening when Plaintiff went to get a drink, Jarrett was seated with a woman presumed to be Jarrett's wife when Jarrett began pointing towards Plaintiff and making mocking and laughing gestures towards Plaintiff when Plaintiff approached him.

542. Jarrett and Plaintiff got into a heated confrontation when Plaintiff leveled attacks on Jarrett's actions and said "those who laugh first, laugh last" whereby Jarrett went into a belligerent tirade against Plaintiff.

543. Plaintiff defended himself and when Jarrett's wife rose to intervene, Plaintiff stated to his wife "you must be so proud to be married to such a man."

544. Jarrett was fully aware that Plaintiff had learned of various harassment of other residents and owners in the Condominium who caught Jarrett in uncompromising positions with another female employee who likely to have evidentiary support after a reasonable opportunity for further investigation or discovery was and is having an affair with Jarrett.

545. Jarrett has harassed this elderly and disabled woman who discovered the affair in order to force and remove her from the building and stalked her.

546. Plaintiff was so upset with Jarrett's behavior, that he wrote the attached e-mail labeled Exhibit 30 upon his return home to the Condo, and e-mailed it in the morning from the Condominium since his Internet service had been terminated by Defendants.

547. On December 18, 2007, Jarrett and Grenuk together, filed in the Superior Court of Fulton County in Georgia, Stalking charges against Plaintiff Lavalle claiming that Lavalle had stalked Jarrett at the Toys-For-Tots party, threatened his wife, cyber-stalked Jarrett via Exhibit 30 sent to Jarrett after the party and Jarrett claimed he was in fear for his safety; that each of the incidents complained of occurred outside of the Condominium; and that each confrontation and communication from Lavalle for a two-year period from 2006 to 2007 were acts of stalking.

548. In their testimony, the two agents of the Defendants, with the Defendant's knowledge and approval, Jarrett and Grenuk, testified to certain facts that contradict known evidence and support that was unavailable to Plaintiff at the time since Jarrett and Grenuk obtained a Temporary Restraining Order against Plaintiff and allowing him to reside in his Condo by telling the judge and court officers that one of them resided in the Condominium.

549. To the contrary, neither man resides in the Condominium and only the Plaintiff resides there.

550. In any event, evidence obtained by the Plaintiffs show that on or about February of 2007, the Defendants, fearful of Lavalle's investigation and dissemination of the

information obtained from the investigation as described above, sought ways to intimidate, harass, abuse and force Lavalle to move from the building.

551. In one heated discussion with Jarrett where Lavalle demanded his removal and said that he would work to see him removed from management of the Condominium, Jarrett replied with words to the effect that "I know Georgia law real good." "I'll get rid of you along time before you ever get rid of me, I've done it before and I'll do it again.

552. He further commented to Lavalle that Lavalle needed to get with the program, that he was in charge of the building now and it was his way or the highway and that if he and Mark Phillips left, the building would go to pot and Plaintiff's investment in their trust would diminish since he and Mark were the best things that have happened to the Condominium.

553. The wrongful foreclosure and stalking complaints which were planned, carried-out and approved by each of the Defendants constitute abuse of process, vexatious litigation and were done with complete malice and disregard to the facts and based on false and perjured testimony.

554. The actions were brought without merit and for the expressed purpose to harass and subdue and wrongfully evict Plaintiff from his property.

555. Soon after obtaining their desired intent to remove Plaintiff from his Condo, the Defendants withdrew and dismissed their wrongful foreclosure complaint.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

### COUNT ELEVEN: TORTIOUS INTERFERENCE

556. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "555" with the same force and effect as though the same were hereinafter more completely set forth.



557. Under the Georgia Condo Act, the Defendants are governed with carrying out their duties under the OBL Bylaws and Declaration.

558. The Plaintiff and Defendants were both charged under the GA Condo Act with complying with the terms and conditions of the Declaration and Bylaws.

559. Plaintiff went to extreme measures to insure his compliance and that of the Defendants.

560. Defendants willfully and wantonly refused to comply with the law.

561. Plaintiff had a business proposal to present to the Association that would have benefited all members of the Association.

562. Defendants intentionally refused to listen to and address the proposal in any manner due to their retaliatory actions directed toward Plaintiff.

563. Defendants had a fiduciary duty to listen to the Plaintiff's proposals.

564. Defendant Rayside had competing business interests that were in conflict to Plaintiff's business plans.

565. Defendants stated they did not wish to address the Plaintiff's proposal since they had their own personal agendas and wanted to control who resided and owned in the building to further their discrimination against certain targeted minority groups.

566. Plaintiff was the entity member allowed by GA law and contract to deal with the Association.

567. Defendants refused to honor those rights and tortiously interfered with his rights as the entity member of the Association.

568. Furthermore, the Defendants created and implemented a slander campaign with false claims designed to damage the personal and business reputation of the Plaintiff in order to drive business away from him.

569. Despite knowing of those duties and the rights conferred upon the Plaintiff via his association as a beneficiary of a trust that owns the Condo that confers upon the Plaintiff the right to represent the Condo in the affairs of the association the Defendants have tortuously interfered with the contractual relationship created

between the Plaintiff and OBL and his rights as both the beneficiary of a trust and attorney-in-fact of the Trust.

570. Defendants have also tortuously interfered with the Plaintiff's ability to conduct family business matters; legal matters, and with business relationships of the Plaintiff and his family.

571. In addition to being the residence of the Plaintiff in Atlanta, the Condo serves as the epicenter for Plaintiff's and his family's business, professional, and philanthropic interests.

572. Computers, hard drives, tapes, and over 150 file boxes and containers are maintained in the Condo.

573. Various client files are also maintained and stored in the Condo.

574. Various business relationships of the Plaintiffs, including one with NOPI Motorsports and its ownership, PEW Sports Group Sports Marketing Group, Pew Mortgage Institute and others, have been severely damaged by the inability of Plaintiff to access the Condo to retrieve documents, contracts, marketing materials, and other deliverables and files of clients and business relationships of the Plaintiff.

575. In addition to the above, Plaintiff had prepared a business proposal for the Defendants to consider with regard to seeking the member's participation in a plan to convert the Condominium to a Condotel concept like neighboring developments to increase the value and utility of units in the building.

576. Defendants violated their fiduciary duty to Plaintiff and other members by refusing to meet with Plaintiff to discuss the business opportunity and present it to the membership for a vote.

577. Instead, Defendants in their desire to control the condo and prevent it from "becoming the Ghetto Grand" called Plaintiff's proposal DOA (Dead on Arrival) without providing a proper audience to listen to the proposal.

578. Defendants have sought to interfere with other business relationships as well.



579. Most recently, they have attacked other realtors in the building in an effort to discredit their credibility as well as position Defendant's agent Jarrett as the sole agent in the building to sell and lease units in the Condominium so as to limit, restrict, prevent, and discriminate against potential owners and residents deemed undesirable by the Defendants according to race, ethnic origin, age, disability and other factors.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT TWELVE: BREACH OF CONTRACT

580. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "579" with the same force and effect as though the same were hereinafter more completely set forth.

581. Defendants and Plaintiff were and are governed by condominium instruments as defined in the Declaration in paragraph 2. (m) that states:

     a. "Condominium Instruments shall mean this Declaration and all exhibits to this Declaration, including the Bylaws of the Association..."

582. Defendants breached paragraphs 5-6 of the Declaration Of Condominium agreement by, inter alia, removing parking spaces intended for handicap parking as well as storage units meant for use by the association and on information and belief, selling and/or leasing such units without the approval or vote of the majority of members, including the Plaintiff.

583. Defendants breached paragraphs 9 of the Declaration Of Condominium agreement by, inter alia, creating, maintaining, and concealing a scheme whereby major portions of utility bills were commingled, assessed, and collected from the Homeowners and Residents instead of being added to the annual assessment as part of the total allocation for costs related to liability for common expenses as defined in paragraph 9.

584. Defendants breached paragraphs 10 (b) of the Declaration Of Condominium agreement by, inter alia, creating a rule and regulation against the Plaintiff that has nothing to do whatsoever with any act that uses the Condominium, the Subject Property, Limited Common Elements and Common Elements.

585. Defendants breached paragraphs 10 (b) of the Declaration Of Condominium agreement by, inter alia, creating a rule and regulation and improperly imposing a fine multiple times for the same incident against the Plaintiff's Trust due to actions the Plaintiff took directly due to Defendant's wrongful acts, harassment and violation of the Declaration and that has nothing to do whatsoever with any act that uses the Condominium, the Subject Property, Limited Common Elements and Common Elements.

586. Defendants breached paragraphs 10 (e) of the Declaration Of Condominium agreement by, inter alia, taking substantial insurance proceeds meant to repair electric meters and allocating that money to other expenses in the budget and then improperly charging the Trust in excess of $400.00 for such electric meters.

587. Defendants breached paragraphs 10 (e) of the Declaration Of Condominium agreement by, inter alia, taking substantial insurance proceeds meant to repair water damage to the lobby ceiling and allocating that money to other expenses in the budget without properly repairing the ceiling.

588. Defendants breached paragraphs 11 (c) (i) of the Declaration Of Condominium agreement by, inter alia, charging and assessing interest and late fees on other charges, fees, costs, fines, and assessments which were other than the allowable "monthly installment of annual assessment" as the Declaration only provides for.

589. Defendants breached paragraphs 11 (c) (iv)of the Declaration Of Condominium agreement by, inter alia, taking actions against the Plaintiff limiting his access to common elements and his right to enjoyment of the Condominium when his trust was not in default and no suit had been filed.

590. Defendants breached paragraphs 11 (c) (v) of the Declaration Of Condominium agreement by, inter alia, taking actions to suspend the Plaintiff's telephone and



internet services without first obtaining a judgment in excess of $750.00 from a court of competent jurisdiction.

591. Defendants breached paragraphs 11 (c) (v) of the Declaration Of Condominium agreement by, inter alia, taking actions to suspend the Plaintiff's telephone and internet services even after payment of disputed assessments, fees, and costs had been made.

592. Defendants breached paragraphs 11 (e) of the Declaration Of Condominium agreement by, inter alia, creating one special assessment for Electric Meters and dividing it into two fiscal years, instead of one year, that exceeds the $200.00 limitation per unit per year contained in the provision.

593. Defendants breached paragraphs 11 (e) of the Declaration Of Condominium agreement by, inter alia, creating one special assessment for Electric Meters that exceeds the $200.00 limitation per unit per year contained in the provision and charging the Trust over $350.00 at a rate of $50.00 per month From January 1, 2007 through July, 2007.

594. Defendants breached paragraphs 11 (h) of the Declaration Of Condominium agreement by, inter alia not applying surplus funds remaining from the special assessment to payment of Common Expenses or distributed to all owners in proportion to the liability for Common Expenses attributable to each unit, or added to the Association's reserve account when such surplus funds were returned to a limited group of owners, that included certain OBL board members.

595. Defendants breached paragraphs 12 (a) (iv) of the Declaration Of Condominium agreement by, inter alia, maintaining an insurance policy with deductibles in excess of $1000.00 as provided in the Declaration.

596. Defendants breached paragraph 16. (b) of the Declaration Of Condominium agreement by, inter alia, failing to properly monitor and regulate the leasing of unit to keep such level under 25% in past years.

597. Defendants breached paragraph 18. (b) of the Declaration Of Condominium agreement by, inter alia, failing to properly maintain and repair the common water



pipes running through the Condo, after several proper notices to OBL, that caused damages to the Condo and the unit #107 below.

598. Defendants breached paragraph 18. (b) of the Declaration Of Condominium agreement by, inter alia, failing to properly maintain and repair the common sewage and toilet pipes running through the Condo, after several proper notices to OBL, that caused damages to the Condo.

599. Defendants breached paragraph 18. (b) of the Declaration Of Condominium agreement by, inter alia, failing to properly repair the damages made to the Condo due to the repairs made to the common pipes.

600. Defendants breached paragraph 18. (d) (i) of the Declaration Of Condominium agreement by, inter alia, failing to seek approval of the Owners of the Condominium prior to the mandatory requirement, subject to fines, that over $300.00 be spent, due to insurance, casualty, and liability concerns concerning aging water heaters be replaced for a cost to Owners and the Trust of at least $500.00 in a twelve month period.

601. Defendants breached paragraph 18. (d) (ii) of the Declaration Of Condominium agreement by, inter alia, failing to provide the Trust with a Fifteen days' written notice to perform the act, even though it violated paragraph 18. (d) (i) of the Declaration Of Condominium, and then install the mandatory water heaters and assess such cost to the Trust, instead of assessing fines far in excess of the unauthorized cost of the water heaters.

602. Defendants breached paragraph 20. (b) of the Declaration Of Condominium agreement by, inter alia, failing to act upon over four dozen requests of the Plaitiff and other Occupants to meet to resolve their grievances in a special hearing and refusing to meet with the Plaintiff after over forty requests to do so and failing to act in good faith to resolve such disputes.

603. Defendants breached paragraph 22. (a) of the Declaration Of Condominium agreement by, inter alia, banning the Plaintiff and his guest from Common Elements when all lawful assessments were paid.

604. Defendants breached paragraph 22. (a) of the Declaration Of Condominium agreement by, inter alia, banning the Plaintiff from his Atlanta residence by having its president and treasurer obtain a TRO, via false and perjured filings, barring Plaintiff from coming within 200 yards of the Trust property, even though neither the President or Property Manager live on the property.

605. Defendants breached paragraph 22. of the Declaration Of Condominium agreement by, inter alia, arbitrarily taking actions as described above and herein that are in violation of several provisions of the Declaration and not seeking a vote from 2/3 of the owners to amend the Declaration or Bylaws to allow such acts.

606. Furthermore, the agreement between the parties also extends the Declaration to the By-Laws of OBL that govern how it shall govern, rule, act and upon which authority it has to do so. As such, the following additional violations extend from violation of the OBL by-laws:

607. Defendants breached Article I, Section 5. of OBL By-Laws and agreement by, inter alia, failing to accept the fact that the beneficiary of the Trust, the Plaintiff, that is the Owner, has a right to represent the Trust to his benefit in dealing with the Association.

608. Defendants breached Article II, Section 2. of OBL By-Laws and agreement by, inter alia, failing to provide the names and addresses of all current owners on several requests by Plaintiff and the Trust, in order for them to canvas and request a special meeting of the Association.

609. Defendants breached Article III, B. Section 12. of OBL By-Laws and agreement by, inter alia, by failing to maintain proper minutes for each Meeting of the OBL Board.

610. Defendants breached Article III, B. Section 13. of OBL By-Laws and agreement by, inter alia, by failing to allow Plaintiff into an Open Meeting of the board, then claiming to go into closed session, and threatening to have him arrested.

611. Defendants breached Article III, C. Section 15. (l) of OBL By-Laws and agreement by, inter alia, by failing to keep adequate books with detailed accounts of the receipts and expenditures from the inception of the Association through May, 2004.



612. Defendants breached Article IV, Section 8 of OBL By-Laws and agreement by, inter alia, by failing to maintain full and accurate financial records and books of account.

613. Defendants breached Article V, Section 1 of OBL By-Laws and agreement by, inter alia, by failing to provide copies of all rules and regulations to the Plaintiff and all owners and occupants; creating unreasonable fines; providing proper notice to the Plaintiff; failing to assess the fine to the Plaintiff first; and failing to set a time period as to when such a fine is due.

614. Defendants breached Article V, Section 2 of OBL By-Laws and agreement by, inter alia, improperly disconnecting the phone and Internet service of the Plaintiff without following the procedures outlined in Paragraph 10 (c) (v).

615. Defendants breached Article V, Section 2 (a) of OBL By-Laws and agreement by, inter alia, by failing to provide Plaintiff [the Violator] with written notice of each violation; the amount of fine being imposed; and right to request a hearing to appeal the fine or reconsideration of the fine.

616. Defendants breached Article V, Section 2 (b) of OBL By-Laws and agreement by, inter alia, by failing to provide Plaintiff [the Violator] with the opportunity to request a hearing or contest each fine being assessed due to the ban on his contact with Board, let alone any notice of the fines to Plaintiffâ.

617. Defendants breached Article VI, Section 9 (a) of OBL By-Laws and agreement by, inter alia, by failing to maintain and provide to the Trust and Plaintiff; Articles of Incorporation and Amendments; Bylaws currently in effect; resolutions adopted by Board; minutes of all Board meetings; written communications to members over 3 years; list of names of directors and officers.

618. Defendants breached Article VI, Section 9 (b) of OBL By-Laws and agreement by, inter alia, by failing to maintain and provide to the Trust and Plaintiff; accounting records and the membership list.

619. Defendants breached the Declaration Of Condominium agreement by, inter alia imposing and multiplying unreasonable fines for the identical actions of the Primary



Occupant in assessing fines on a per person basis rather than a per occurrence or incident basis.

620. As a direct and proximate cause of OBL's conduct, the Plaintiffs have sustained damage to its property as heretofore alleged and the value of its condominium unit and corpus of the Trust has been decreased by no less that $250,000.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT THIRTEEN: NEGLIGENT MISPRESENTATION

621. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "620" with the same force and effect as though the same were hereinafter more completely set forth.

622. At the time Defendants made their representations to the Plaintiff of amounts claimed to be owed from June 2006 through December of 2007 they owed a duty to the Plaintiff, inter alia, to promptly provide accurate and supportable accountings and monthly invoice figures and to terminate collection and foreclosure proceedings pending such documentation and support and to properly investigate, note, and deal with his disputes.

623. Defendants breached their duty by failing to provide account or accounting figures and support, especially accounting documents and ledgers from July of 2002 through May of 2004 and continuing to proceed with threats of foreclosure, collection efforts and actual foreclosure action on the Trust property even after being paid all sums owed and more.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT FOURTEEN: MISFEASANCE, NONFEASANCE & MALFEASANCE

624. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "623" with the same force and effect as though the same were hereinafter more completely set forth.

625. Defendants where charged with dutifully and lawfully carrying out the provisions of the OBL Condominium Instruments, particularly the OBL Declaration and Bylaws.

626. The Condominium Instruments created a contract and agreement between the Plaintiff and Defendants.

627. Defendants owed a duty of care to the Plaintiff who was the entity member of the Association that Defendants were directed with managing.

628. Defendants took affirmative steps to create, approve, direct, enact, carryout, and conceal wrongful, unlawful, illegal, and even criminal acts directed to the Plaintiff that caused direct and proximate damages to the Plaintiff, his personal and professional reputation, his business interests, and property.

629. Defendants willfully ignored dutifully and lawfully carrying out the provisions of the OBL Condominium Instruments, particularly the OBL Declaration and Bylaws.

630. Defendants inadequately and poorly performed some of their duties in carrying out the provisions of the OBL Condominium Instruments, particularly the OBL Declaration and Bylaws, particularly the repairs due to the Plaintiff's Condo.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT FIFTEEN - - INTENTIONAL & NEGLIGENT INFLCITION OF EMOTIONAL DISTRESS

631. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "630" with the same force and effect as though the same were hereinafter more completely set forth.

632. Defendant's conduct was outrageous, heinous and beyond the standards of civilized decency and utterly intolerable in a civilized society.

633. Defendant's conduct was extreme and outrageous and was part of a pattern of conduct and not just an isolated incident.

634. Defendants ignored the implications of their conduct directed towards the Plaintiff.

635. Defendants took libelous and slanderous acts toward the Plaintiff.

636. Defendant's claimed that Plaintiff suffered from a mental illness who was prone to their provocation and thus the Defendants believed and knew that the Plaintiff was vulnerable to the intentional acts of the Defendants.

637. Defendant's were fully aware that Plaintiff's family suffered from high blood pressure, diabetes, depression, anxiety, sleepless nights, Alzheimer's, and other infirmities, and were told not to contact the Plaintiff's family at any time since they were vulnerable and prone to further suffering by the Defendant's acts, yet despite such warning, they continued their harassment of the Plaintiff's family.

638. The acts of the Defendants were not negligent and were carefully planned, calculated, and carried out to defame, hurt, and damage the Plaintiff.

639. Defendants owed the Plaintiff a fiduciary duty and duty of care as members of the board and management of OBL.

640. Defendants were in a position of power by their direction, control and management of the Association and Condominium.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT SIXTEEN - - ASSAULT & BATTERY

641. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "640" with the same force and effect as though the same were hereinafter more completely set forth.

642. Defendants Grenuk and Allen as well as their employee, Mark Phillips did commit the act of intentionally assaulting the Plaintiff that caused the Plaintiff reasonable apprehension of an immediate harmful and offensive contact.

643. Defendants Grenuk and Allen as well as their employee, Mark Phillips committed these acts on and off the property of the Plaintiff.

644. On or about February 15, Defendant Grenuk came from a distance from about seven feet towards Plaintiff with his fists drawn in attempt to threaten and physically strike of Plaintiff the Plaintiff and Defendant Grenuk exchanged words over Grenuk's abusive conduct directed at a concierge of the Condominium.

645. Soon thereafter, when Plaintiff entered the Condominium property office, to complain about Defendant Grenuk's assault and to ask Defendant Jarrett to preserve videotape of the assault by Grenuk, Grenuk along with Mark Phillips again took aggressive steps by rising and then moving towards Plaintiff in an effort to strike him when the Condominium's concierge, Kevin Young, stepped in between Plaintiff and Grenuk and Phillips to prevent them from striking the Plaintiff.

646. On or about March 2, 2006, Defendant OBL's employee, Mark Phillips, did with intent, physically assault and batter the Plaintiff by aggressively grabbing Plaintiff and forcibly pushing Plaintiff against his will and without restraint or fight by the Plaintiff, out of the property office of his Condominium where he had come to complain about the Defendants unlawful and wrongful disconnection of Plaintiff's telephone and 911 service and slamming the door shut on Plaintiff.

647. Defendant Jarrett fired the Condominium's concierge, Kevin Young a former Marine, since he would not go along with fabricating evidence and providing perjurious testimony against the Plaintiff.

648. Jarrett asked Young to write reports about what he witnessed and asked his to rewrite what he originally wrote in order to skew the version of events that were witnessed.

649. On three occasions between January 1, 2003 and the present date, Defendant Mark Allen did with intent, physically threaten and strike the Plaintiff in public places that included a nightclub and houseboat.

650. The unnecessary and aggressive acts described above were harmful and offensive to the Plaintiff and were without his consent.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT SEVENTEEN - - CIVIL CONSPIRACY

651. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "650" with the same force and effect as though the same were hereinafter more completely set forth.

652. Defendants made several agreements and preconceived several plans, to conduct the various unlawful acts as described above and herein.

653. Defendants engaged in concerted actions whereby by a combination of two or more of the Defendants conspired to accomplish an unlawful purpose or a lawful purpose by criminal or unlawful means that caused substantial damage to the Plaintiff and other members of the Association.

654. The unlawful plans described herein and above included, but are not limited to plans to:

    a. Bring fraudulent stalking charges against the Plaintiff;

    b. File a wrongful foreclosure action against the Plaintiff's Condo and Trust;

    c. Fraudulently increase Plaintiff's water bills by 2000%;

    d. Fraudulently bill Plaintiff and other members for utility services never provided;

    e. Return leftover money from the special assessment to a select group of owners, including many of the Defendants;

f.   Bill Plaintiff and other members for bills they were not legally responsible for;

g.   Disconnect the Plaintiff's and other members telephone and 911 service;

h.   Fraudulently assess fines against the Plaintiff for acts protected under law;

i.   Fraudulently assess fines against Plaintiff and other members for water heaters not installed by unlawful demand by Defendants;

j.   Bill Plaintiff and other members of the Association for meter utility usage for water and electric utilities never provided;

k.   Invade the Plaintiff's privacy by placing him under surveillance and monitoring his internet usage;

l.   Breaking and entering into the Plaintiff's storage unit;

m.   Re-keying the locks to the Plaintiff's storage unit;

n.   Defame, slander, and libel Plaintiff be claiming he was:

    i.   Banned from the building and under threat of arrest back in July of 2007;

    ii.   Mentally ill and suffered from bi-polar, depression or Pick's disease;

    iii.   Delinquent in his payments to the Association;

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## COUNT EIGHTEEN - - VIOLATION OF FEDERAL FAIR HOUSING ACT

655. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "654" with the same force and effect as though the same were hereinafter more completely set forth.

656. Plaintiff is an "aggrieved person" as defined in Sec. 802. [42 U.S.C. 3602]



657. The Condominium consist of 232 residential units with four elevators, many having mortgages guaranteed, supported, and/or owned by Federal agencies including, but not limited to Ginnie Mae, HUD, FHA, the VA and/or Federal Government Sponsored Enterprises such as Fannie Mae and Freddie Mac.

658. The Condominium has been run from its inception in 1999 by an all white board with nominations for new board members made by an appointed all white board and nominations for new board member being all white despite the fact that membership, ownership, and occupancy in the building is approximately 33% to 40% minority.

659. Defendants have engaged in the following prohibited practices as described in Sec. 804. [42 U.S.C. 3604] of the Act:

   a. Interfering in the ability of persons of race, color, and national origin to enter the Condominium to inquire about purchase and lease of units in the building in violation of Sec. 804. [42 U.S.C. 3604] (a) and (d)

   b. Discriminating against persons of race, color in the terms, conditions, or *privileges of sale or rental of a dwelling* or in the *provision of services or facilities in connection therewith...*(emphasis added) in violation of Sec. 804. [42 U.S.C. 3604] (b) by:

      i. withdrawing their privileges for common use of common elements;

      ii. Over-billing targeted minorities for their utilities;

      iii. Setting different collection standards for minority groups and people targeted;

      iv. Aggressively foreclosing on minorities and not on other groups;

      v. Denying minority members rights, services and access to documents such as billing records; membership lists; and minutes of board meetings

   c. Making and printing notices,... *statements indicating preference, limitation, or discrimination* based on race, color, religion, sex, handicap,



familial status, or national origin, or an intention to make any such preference, limitation, or discrimination in violation of Sec. 804. [42 U.S.C. 3604] (c) by:

    i. Spreading word throughout the community that they were getting rid of Blacks; the disabled and elderly; and gang-bangers;

    ii. Informing real estate agents that Defendants needed to clear new owners and renters with Defendants;

    iii. Removing all handicap parking spots in the building.

WHEREFORE, by reason of the forgoing, Plaintiff has suffered damages that are within this Court's jurisdictional limits and he prays for the relief and damages set forth herein and below.

## DAMAGES

660. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "659" with the same force and effect as though the same were hereinafter more completely set forth.

661. By reason of the foregoing violations as described above and herein, Plaintiff has suffered damages to his property and person in such amount as may be determined by a jury.

662. The actions of Defendants have caused emotional distress, duress, humiliation, angst, anger, frustration, loss of credibility, and reputation for the Plaintiff.

663. Plaintiff has had to maintain insurance costs without the benefit of access to his residence, property, automobile and medical care;

664. Plaintiff has been denied his ability to seek necessary medical tests, surgical operations, and treatment that has had an impact on his health and well-being;

665. Plaintiff has suffered the scorn and ridicule of neighbors, strangers, owners, residents, and friends due to the Plaintiff's actions;

666. The value of Plaintiff's lawsuits against other parties has been diminished due to the Defendant's actions;

667. Plaintiff has had his personal liberty denied;

668. Plaintiff has had his privacy invaded;

669. Plaintiff has been physically assaulted and battered by the Defendants and their employees;

670. Plaintiff's inability to enjoy his personal, love, and social life;

671. Plaintiff's access to his belongings, clothing, books, records, and client files;

672. Said damages include, but are not limited to: payments for fees and expenses in attempting to pay-off obligations; damages to trust corpus; damages to personal, business, and community reputation; damages to business interests; liability to clients; damages to value of property; expenses related to accounting costs; costs associated with additional medical expenses; costs associated with additional living and travel expenses; costs associated with additional business expenses; costs associated with additional legal and accounting expenses; costs associated with additional personal living expenses; costs associated with new clothing and shoes; costs associated with unlawful eviction; legal fees, expert fees, investigation fees; internet and programming fees; mailing and e-mail costs; additional support and worker costs;

673. PR, advertising, communication costs and fees to rehabilitate Plaintiff's name, image, and reputation amongst his neighbors, friends, business associated and community.

674. Defendant's offenses and Plaintiff's damages are ongoing and it can be reasonably anticipated that future damage to property, business physical and mental health may result.

## INJUNCTIVE RELIEF

675. Plaintiff repeats and reiterates each and very allegation contained in paragraphs "1" to "674" with the same force and effect as though the same were hereinafter more completely set forth.

676. Defendants are continuing to unlawfully exploit their positions as board members of OBL to advance their own interests at the expense of other homeowners and residents.

677. Consumers, homeowners, and residents including the Plaintiff, of his building and those that also reside in the state of Florida will continue to be irreparably harmed if Defendants are not enjoined from their unlawful actions.

678. By reason of the foregoing as a consumer, the Plaintiff is entitled to an Order enjoining Defendants from taking the following wrongful and unlawful acts:

   a. Defendants billing Plaintiff in his personal name;

   b. Defendants removal of any additional handicap parking spots;

   c. Defendant leasing or selling any additional parking spots in the building;

   d. Defendants purchase of a penthouse condo in the building;

   e. Defendants use of Ed Jarrett as a sales or leasing agent;

   f. Defendants communication to any real estate agent to have all owners and renters approved;

   g. Defendants harassing any elderly, disabled, or minority person;

   h. Defendants refusing to provide any owner or designated agent or member with a list of other members when requested;

   i. Defendants from destroying any documents whatsoever, but especially ballots and proxies from prior elections that Plaintiff requested preserved;

   j. Defendants charging, billing or collecting any cost from Plaintiff's Trust for any fee, expense or cost other that the regular monthly COA fee and any special assessment properly voted on and approved by the membership of OBL;

   k. Defendants reading their own meters for utility services;

   l. Defendants assessing any fine to any homeowner or resident without providing proper notice of:

    i.  Date fine is due;

    ii.  Nature of the violation;

    iii.  Right to appeal the fine.

m.  Defendants placing name of Plaintiff or his Trust or any other homeowner or resident in any deadbeat's list;

n.  Billing in advance for services not provided;

o.  Defendants having their agents bill consumers, homeowners, and residents for fines, late fees, legal fees or any past due or defaulted amount without proper notice and a mini-miranda notice that they have a right, under the law, to dispute the amounts claimed owed and seek proper validation.

p.  Defendants from billing consumers, homeowners, and residents for COA/HOA fines and legal fees without insuring that proper notice from its client, informing the homeowner or resident of all their due process rights, as applicable, to appeal under the law of their state or under their HOA/COA instruments or:

    i.  If such notice was not provided, to provide such legal notice as part of their debt collection notice.

q.  Defendants be prohibited from operating or collecting debts in the state of Florida without proper registration of their agents with the state as a registered debt collector.

r.  Defendant billing OBL homeowners and residents with:

    i.  Water heater fines;

    ii.  Water, Water Service Charges;

    iii.  Any fines, assessments, legal fees or any amount other than the monthly OBL HOA fee and metered utility billing without approval of the Court or a special master.

## DEMAND FOR JURY TRIAL

679. Plaintiff respectfully demands a trial by jury in this matter.


## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer, and after final hearing of this cause, the Court enter judgment as follows:

680. That Plaintiff recover its actual damages in the amounts found by the jury in no case less than $10,000.000.00.

681. That Plaintiff's damages be trebled pursuant to the provisions of Florida law as described herein and above;

682. That Defendants disgorge all fees, revenues, and profits gained on operation of the Fraudulent Utility Rebilling Enterprise and that the Plaintiff recover its proportionate share thereof and the remaining amounts placed into the registry of the Court for distribution to victims of the enterprise;

683. That Plaintiff recover reasonable attorney's fees incurred in the prosecution of the RICO, breach of contract claims, FLA Debt Collection claims and all claims described above and herein that entitle Plaintiff to reasonable attorney's fees.

684. That Defendants be enjoined from the activities as described above and herein;

685. That Plaintiff recover punitive damages from the Defendants as afforded by Florida law;

686. The conduct of Defendants was heinous and part of general fraudulent practices constituting "COA/HOA abuse and fraud" aimed at select groups, the Plaintiff and the public in general and was a part of a pattern of conduct causing grave damage to the public, Plaintiff is entitled to punitive damages in such amount as may be determined at trial.



687. That the punitive damages so awarded be of a nature to protect the public interest, residents, and consumers of this state and that the punitive damages be a minimum of $25,000.000.00 or approximately 1/3 the value of the building;

688. Plaintiff further prays for any such other and further relief, whether at law or in equity, to which he may be justly entitled.

Dated: Boca Raton, Florida
      May 5, 2008

 

NYE LAVALLE
"Plaintiff"
10675 Pebble Cove Lane
Boca Raton, FLA 33498
561/210-7171

## VERIFICATION & AFFIDAVIT

| | | |
|---|---|---|
| STATE OF FLORIDA | ) | |
| | ) | ss.: |
| COUNTY OF PALM BEACH | ) | |

I, Nye Lavalle, do hereby depose and state as follows:

1.  I am the Plaintiff named in the Complaint herein and the beneficiary of the Trust.

2.  Article I Section 5. Of the Bylaws of OBL Titled Entity Members states "In the event an Owner is a corporation, partnership, trust, or other legal entity not being a natural person, then any natural person who is an officer, director, or other designated agent of such corporation, partner of such partnership, *beneficiary or other designated agent* of such trust, or manager of such legal entity shall be eligible to represent such entity or entities in the affairs of the Association."

3.  As such, over the past 18 months, I undertook an extensive investigation of the claims, allegations, and facts described above.

4.  My investigation and knowledge gained therein and from my prior investigations and experience have involved the review of over one hundred thousands of pages of documents and evidence to date that relate to the facts and allegations stated in the Complaint and over a 1000 pages of documents related to Defendants and OBL.

5.  I am fully familiar with the facts set forth in the Verified Complaint herein and have personal knowledge of the facts set-forth therein, which I hereby incorporate by reference into this Verification.

6.  The facts and allegations of said Verified Complaint are true to the best of my own knowledge and are based upon my personal participation in the events set forth; my review, analysis, audit and knowledge of the books and records, supplied to me by OBL, the Defendants, and Trustee; and my independent investigations.

Signed under pains and penalties of perjury this 5th day of May, 2008

NYE LAVALLE "PLAINTIFF"

# EXHIBIT 1

GEORGIA. FULTON COUNTY
FILED AND RECORDED

1999 JUL 16  PM 12: 25

JUANITA HICKS
CLERK. SUPERIOR COURT

Return to:
Janie Platt Lyons, Esq.
Weissman, Nowack, Curry & Wilco, P.C.
Two Midtown Plaza, 15th Floor
1349 West Peachtree Street
Atlanta, Georgia 30309

# DECLARATION OF CONDOMINIUM

## FOR

## ONE BUCKHEAD LOOP CONDOMINIUM

WEISSMAN, NOWACK, CURRY, & WILCO, P.C.
Attorneys

Two Midtown Plaza, 15th Floor
1349 West Peachtree Street
Atlanta, Georgia  30309
(404) 885-9215

BOOK 27056PG177

STATE OF GEORGIA
COUNTY OF FULTON

## DECLARATION OF CONDOMINIUM

## FOR

## ONE BUCKHEAD LOOP CONDOMINIUM

THIS DECLARATION is made on the date set forth below by 730 Peachtree Holdings, Limited Partnership, a Georgia limited partnership (hereinafter referred to as "Declarant");

### WITNESETH

WHEREAS, Declarant is the owner of the real property which is located in Fulton County, Georgia and is described in Exhibit "A" attached hereto and incorporated herein by this reference; and

WHEREAS, a plat related to the Condominium prepared by W. K. Dickson dated July 9, 1999 was filed in Condominium Plat Book 11 , Page(s) 92 , Fulton County, Georgia Records; and

WHEREAS, floor plans relating to the Condominium prepared by Ai Group were filed in Condominium File Cabinet No. 2 , Folder No. 386, of the Fulton County, Georgia Records; and

WHEREAS, Declarant desires to subject the real property described in Exhibit "A" hereto, including the improvements thereof, to the provisions of this Declaration and to the Georgia Condominium Act;

NOW, THEREFORE, Declarant hereby declares that the real property described in Exhibit "A" of this Declaration, including the improvements located thereon, is hereby submitted and made subject to the form of ownership set forth in the Georgia Condominium Act, and is hereby subjected to the provisions of this Declaration. By virtue of the recording of this Declaration, said property shall be held, sold, transferred, conveyed, used, occupied, and mortgaged or otherwise encumbered subject to provisions of the Georgia Condominium Act and the covenants, conditions, restrictions, easements, assessments, and liens set forth in this Declaration, which are for the purpose of protecting the value and desirability of, and which shall run with the title to, the real property subject to this Declaration, and shall be binding on all persons having any right, title or interest in all or any portion of the real property subject to this Declaration, their respective heirs, legal representatives, successors, successors-in-title and assigns, and shall be for the benefit of all owners of the property subject to this Declaration.

## TABLE OF CONTENTS

1.  NAME ................................................................................................................ -1-

2.  DEFINITIONS ..................................................................................................... -1-

3.  LOCATION, PROPERTY DESCRIPTION, PLATS AND PLANS.............................. -3-

4.  UNITS AND BOUNDARIES.................................................................................. -3-

5.  COMMON ELEMENTS ......................................................................................... -4-

6.  LIMITED COMMON ELEMENTS. ......................................................................... -5-

7.  RIGHT TO RELOCATE CERTAIN EQUIPMENT SERVING UNIT ................................. -6-

8.  ASSOCIATION MEMBERSHIP AND ALLOCATION OF VOTES ............................... -6-

9.  ALLOCATION OF LIABILITY FOR COMMON EXPENSES........................................ -6-

10. ASSOCIATION RIGHTS AND RESTRICTIONS ....................................................... -7-

11. ASSESSMENTS ................................................................................................... -8-

12. INSURANCE........................................................................................................ -11-

13. REPAIR AND RECONSTRUCTION........................................................................ -14-

14. ARCHITECTURAL CONTROLS ............................................................................. -15-

15. USE RESTRICTIONS ............................................................................................ -17-

16. LEASING ........................................................................................................... -26-

17. SALE OF UNITS.................................................................................................. -29-

18. MAINTENANCE RESPONSIBILITY ........................................................................ -29-

19. MORTGAGEE'S RIGHTS ...................................................................................... -32-

20. GENERAL PROVISIONS ....................................................................................... -33-

21. EMINENT DOMAIN............................................................................................. -35-

22. EASEMENTS ...................................................................................................... -36-

Table of Contents (con't)

23.   AMENDMENTS ............................................................................................... -37-

24.   SEVERABILITY............................................................................................... -38-

25.   DECLARANT RIGHTS ................................................................................... -38-

26.   PREPARER ...................................................................................................... -38-

## EXHIBITS

DESCRIPTION OF SUBMITTED PROPERTY ....................................................... "A"

UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS AND
LIABILITIES FOR COMMON EXPENSES............................................................. "B"

BYLAWS .................................................................................................................. "C"

## DECLARATION OF CONDOMINIUM

### FOR

### ONE BUCKHEAD LOOP CONDOMINIUM

1.    **NAME.**

The name of the condominium is One Buckhead Loop Condominium (hereinafter sometimes called "One Buckhead Loop" or the "Condominium", as further defined herein), which condominium is hereby submitted by Declarant to the Georgia Condominium Act, O.C.G.A. §44-3-70, et seq. (Michie 1982).

2.    **DEFINITIONS.**

Generally, terms used in this Declaration, the Bylaws, and the Articles of Incorporation shall have their normal, generally accepted meanings or the meanings given in the Act or the Georgia Nonprofit Corporation Code.  Unless the context otherwise requires, certain terms used in this Declaration, the Bylaws, and the Articles of Incorporation shall be defined as follows:

(a)    Act shall mean the Georgia Condominium Act, O.C.G.A. §44-3-70, et seq. (Michie 1982), as such act may be amended from time to time.

(b)    Architectural Control Committee or ACC shall mean the committee established to exercise the architectural review powers set forth in Paragraph 14 hereof.

(c)    Area of Common Responsibility shall mean and refer to the Common Elements, together with those areas, if any, which by the terms of this Declaration or by contract or agreement with any other person or entity become the responsibility of the Association.

(d)    Articles or Articles of Incorporation shall mean the Articles of Incorporation of One Buckhead Loop Condominium Association, Inc., which have been filed with the Secretary of State of the State of Georgia.

(e)    Association shall mean One Buckhead Loop Condominium Association, Inc., a Georgia nonprofit corporation, its successors or assigns.

(f)    Board or Board of Directors shall mean the elected body responsible for management and operation of the Association.

(g)    Bylaws shall mean the Bylaws of One Buckhead Loop Condominium Association, Inc., attached to this Declaration as Exhibit "C" and incorporated herein by this reference.

(h)    Commercial Unit(s) shall mean any space shown on the Floor Plans for the Condominium recorded in the Fulton County, Georgia records marked as "Commercial Unit" or "CU" (which may be followed by a number to distinguish one Commercial Unit from another).  Commercial Units 3 and 4 may be hereinafter referred to as the "Guest Suite Units."

(i)     Common Elements shall mean those portions of the property subject to this Declaration which are not included within the boundaries of a Unit, as more particularly described in this Declaration.

(j)     Common Expenses shall mean the expenses incurred or anticipated to be incurred by the Association for the general benefit of the Condominium, including, but not limited to, those expenses incurred for maintaining, repairing, replacing, and operating the Common Elements.

(k)     Community-Wide Standard shall mean the standard of conduct, maintenance, or other activity generally prevailing within the Condominium.   Such standard may be more specifically determined by the Board of Directors and the Architectural Control Committee.

(l)     Condominium shall mean all that property described in Exhibit "A" attached hereto and incorporated herein by this reference, submitted to the provisions of the Act by this Declaration.

(m)     Condominium Instruments shall mean this Declaration and all exhibits to this Declaration, including the Bylaws of the Association, and the plats and plans, all as may be supplemented or amended from time to time.

(n)     Declarant shall mean 730 Peachtree Holdings, Limited Partnership, a Georgia limited partnership, its respective successors and assigns.

(o)     Eligible Mortgage Holder shall mean those holders of first mortgages secured by Units in the Condominium who have requested notice of certain items as set forth in this Declaration.

(p)     Floor Plans shall mean the floor plans for One Buckhead Loop Condominium, filed in the condominium file cabinet of the Fulton County, Georgia records.

(q)     Limited Common Elements shall mean a portion of the Common Elements reserved for the exclusive use of those entitled to occupy one (1) or more, but less than all, Units, as more particularly set forth in this Declaration.

(r)     Majority means those eligible votes, Owners, or other group as the context may indicate totaling more than fifty (50%) percent of the total eligible number.

(s)     Mortgage shall refer to any mortgage, deed to secure debt, deed of trust, or other transfer or conveyance for the purpose of securing the performance of an obligation, including, but not limited to, a transfer or conveyance of fee title for such purpose.

(t)     Mortgagee or Mortgage Holder shall mean the holder of any mortgage.

(u)     Occupant shall mean any Person occupying all or any portion of a Unit for any period of time, regardless of whether such Person is a tenant or the Owner of such property.

(v)     Owner shall mean the record title holder of a Unit within the Condominium, but shall not include a Person who is only a Mortgage Holder.

(w)     Person shall mean any individual, corporation, firm, association, partnership, trust, or other legal entity.

(x)     Residential Unit shall mean all Units except for the Commercial unit as defined above.

- 2 -

(y)    Survey shall mean the plat of survey for One Buckhead Loop Condominium, filed in the condominium plat book of the Fulton County, Georgia records.

(z)    Unit shall mean that portion of the Condominium intended for individual ownership and use as more particularly described in this Declaration and shall include the undivided ownership in the Common Elements assigned to the Unit by this Declaration.

3.    LOCATION, PROPERTY DESCRIPTION, PLATS AND PLANS.

The Condominium subject to this Declaration and the Act is located in Land Lot 62 of the 17th District of Fulton County, Georgia, being more particularly described in Exhibit "A" attached to this Declaration, which exhibit is specifically incorporated herein by this reference. The Survey and Floor Plans relating to the Condominium will be filed in the Fulton County, Georgia records at the time the Property is submitted to this Declaration. The Survey and Floor Plans are incorporated herein by reference as fully as if the same were set forth in their entirety herein.

So long as Declarant owns a Unit, Declarant reserves the right, but shall have no obligation, to make improvements and changes to all or part of the Common Elements and the Units owned by Declarant (other than changes to the location of Unit boundaries unless expressly permitted herein), including, without limitation, addition and realignment of parking spaces, renovation and installation of changes to utility systems and facilities, rearrangement and installation of security and refuse facilities, work relating to building exteriors, and extension of the drives and utility lines and pipes located on the Condominium.

4.    UNITS AND BOUNDARIES.

The Condominium will be divided into two hundred and thirty (230) separate Residential Units, Common Elements, or Limited Common Elements and one (1) or more Commercial Units. Each Unit consists of a dwelling and its appurtenant percentage of undivided interest in the Common Elements. Each Unit shall be conveyed as a separately designated and legally described freehold estate subject to the Act and the Condominium Instruments. The Units are depicted on the Survey and the Floor Plans. Each Unit includes that part of the structure which lies within the following boundaries:

(a)    Vertical Boundaries. The perimetrical or vertical boundaries of each Unit shall be the centerline between the unfinished surfaces of the interior walls of the Unit and the exterior wall of the building or the wall of the Unit adjoining the hallway of the floor on which the Unit is located in the building. With respect to common walls between Units, the perimetrical or vertical boundary of the Units served thereby shall be the centerline of such wall. The vertical boundaries include the sheet rock, on the Unit side of the walls, and they are extended to their intersections with each other and the upper and lower horizontal boundaries of the Unit.

(b)    Horizontal Boundaries. The upper horizontal boundary of each Unit located in the Condominium is the plane formed by the lowermost surface of the concrete subflooring located between the uppermost story of the Unit and the lowermost story of the Unit above it (with the concrete subflooring not constituting part of such lower Unit). The lower horizontal boundary of each Unit located in the Condominium is the plane formed by the lowermost surface of the concrete subflooring on which the lowermost story of the Unit is constructed (with the concrete subflooring constituting part of such Unit).

BOOK 27055R183

(c)    Additional Information to Interpret Unit Boundaries. Entry doors and exterior glass surfaces, including, but not limited to, windows and glass doors, serving the Unit shall be included within the boundaries of the Unit. Heating and air conditioning systems serving a single Unit (including any part of any such system located outside the boundaries of the Unit), all duct work for heating and air conditioning systems and appliances and plumbing fixtures within a Unit shall be part of the Unit.

If any chutes, flues, ducts, conduits, wires, pipes, chimneys, vent covers or other apparatus lies partially within and partially outside of the designated boundaries of the Unit, any portion thereof which serve only that Unit shall be deemed to be a part of that Unit, while any portions thereof which serve more than one Unit or any portion of the Common Elements shall be deemed a part of the Common Elements.

In interpreting deeds and plans, the existing physical boundaries of a Unit as originally constructed or of a Unit reconstructed in substantial accordance with the original plans thereof shall be conclusively presumed to be its boundaries rather than the metes and bounds expressed in any deed or plan, regardless of settling or lateral movement of the building in which the Unit was located, and regardless of minor variance between the boundaries shown on the plans or in a deed and those of the Unit.

The ownership of each Unit shall include, and there shall pass with each Unit, whether or not separately described in the conveyance thereof, that percentage of the right, title and interest in the Common Elements attributable to such Unit, together with membership in the Association and an undivided interest in the funds and assets held by the Association.

5.    COMMON ELEMENTS.

The Common Elements consists of all portions of the Condominium not located within the boundaries of a Unit. The Common Elements include, without limitation, certain utilities, fences, entry feature, paving, walls, retaining walls, landscape areas, outside parking area, underground parking facility, parking garages, mail area, the foundation, roof, and exterior walls of the building, stairs, hallways, lobbies, outdoor patio and garden areas, elevators, elevator shafts, elevator lobbies, mechanical rooms, maintenance rooms, dumpsters, trash chutes, trash compactor, concierge, valet parking and dry cleaning services, fitness facilities, squash court, saunas and locker rooms, swimming pool, gazebos, arbors, concierge desk, conference room, business center, media room, billiards room, hospitality suite, laundry room, central vacuum system, limited access gated entry system and all furnishing, fixtures and personalty on the Common Elements.

Ownership of the Common Elements shall be by the Unit Owners as tenants-in-common.  The percentage of undivided interest in and to the Common Elements attributable to each Unit is set forth on Exhibit "B."  Such percentages of undivided interest may be altered only by the consent of all Owners and Mortgagees (or such lesser number of Owners and Mortgagees as may hereafter be prescribed by the Act) expressed in a duly recorded amendment to this Declaration.

The Common Elements shall remain undivided, and no Owner nor any other person shall bring any action for partition or division of the whole or any part thereof except as provided in the Act.  Except as provided for Limited Common Elements or as otherwise provided herein, each Owner and the Association may use the Common Elements for the purposes for which they are intended, but no such use shall enter or encroach upon the lawful rights of the other Owners.

BOOK 27056ñ184

6.    **LIMITED COMMON ELEMENTS**.

(a)    The Limited Common Elements located on the Condominium and the Unit(s) to which they are assigned are:

(i)    entry foyers, hallways, corridors, elevator lobbies, and stairs serving more than one but less than all Units, as shown on the Floor Plans, are assigned as Limited Common Elements to the Units which they serve;

(ii)    the portion of the Common Elements on which there is located any portion of the air conditioning or heating system exclusively serving a particular Unit or Units is assigned as Limited Common Element to the Unit or Units so served;

(iii)    any utility meter which serves only one Unit is assigned as a Limited Common Element to the Unit so served;

(iv)    a Unit may be assigned one (1) or more parking spaces which are shown on the Floor Plans as Limited Common Elements.  Parking spaces may be initially assigned or reassigned by amendment to this Declaration as provided in subparagraphs (b) and (c) below;

(v)    a Unit may be assigned one (1) or more garages which are shown on the Floor Plans as Limited Common Elements.  Garages may be initially assigned or reassigned by amendment to this Declaration as provided in subparagraphs (b) and (c) below;

(vi)    each Unit may be assigned one (1) or more storage spaces which are shown on the Floor Plans as Limited Common Elements. Storage spaces may be initially assigned or reassigned by amendment to this Declaration as provided in subparagraphs (b) and (c) below;

(vii)    any balcony attached to and serving only one (1) Unit is assigned as a Limited Common Element to the Unit to which it is attached and which it serves;

(viii)    any chimney adjoined and connected to a Unit is assigned as a Limited Common Element to the Unit to which it is adjoined and connected;

(ix)    each Unit is assigned one (1) mailbox or mail slot; and

(x)    the exercise room on the penthouse floor is assigned as a Limited Common Element to the Units located on the penthouse floor.

(b)    The Association's Board of Directors, without need for a membership vote, is hereby authorized to assign and to reassign Limited Common Elements and Common Elements not previously assigned, provided that any such assignment or reassignment shall be made in accordance with the provisions of Section 44-3-82(b) and (c) of the Act.  A Common Element not previously assigned as a Limited Common Element may be so assigned and a Limited Common Element may be reassigned by the Board, without the need for a vote of the Association, upon written application to the Association by the Unit Owner or Owners for whose exclusive use such Common Element is requested or whose use of the Limited Common Element previously assigned is directly affected.    Upon such application, the Association shall prepare and execute an amendment to the Declaration assigning the Common Element as

BOOK 27050m 185

a Limited Common Element or reassigning the Limited Common Element, which amendment shall be executed by the Owner or Owners making such application. Such amendment shall be delivered and become effective as provided in Section 44-3-82 of the Act. An amendment to assign a Common Element, not previously assigned as a Limited Common Element shall not require the approval of the Association or the Board, if the request is made by the Declarant, or its affiliate. Such a request made by any other Person shall require the Board's consent.

(c)    For so long as Declarant owns any Unit primarily for the purpose of sale, Declarant shall have the right to sell to Unit Owners one (1) or more parking spaces, garages and storage spaces to be assigned as Limited Common Elements pursuant to subparagraphs (a) and (b) above. The proceeds of the sale of parking spaces, garages and storage spaces as Limited Common Elements shall belong to the Declarant.

7.    **RIGHT TO RELOCATE CERTAIN EQUIPMENT SERVING A UNIT.**

Notwithstanding any provision to the contrary contained herein, the Association's Board of Directors at the sole expense of the Association shall have the right without need for a membership vote and without the consent of any affected Unit Owner, to relocate any portion of the air conditioning, heating, plumbing, ventilating, exhaust or electrical system serving a particular Unit, provided that after such relocation, the system serving the Unit functions at least as well and at no greater cost to the Unit Owner as existed prior to the relocation.

8.    **ASSOCIATION MEMBERSHIP AND ALLOCATION OF VOTES.**

All Unit Owners, by virtue of their ownership of a fee or undivided fee interest in any Unit in the Condominium, excluding Persons holding such interest under a Mortgage, are members of the One Buckhead Loop Condominium Association, Inc., and, except as otherwise provided herein or in the Bylaws, shall be entitled to vote on all matters upon which members of the Association are entitled to vote pursuant to the Declaration and in accordance with the Bylaws. Subject to the provisions of the Condominium Instruments, the Owner or collective Owners of a Unit shall be entitled to one (1) equally weighted vote for such Unit.

9.    **ALLOCATION OF LIABILITY FOR COMMON EXPENSES.**

(a)    Except as provided below, or elsewhere in the Act or Condominium Instruments, the amount of all Common Expenses shall be assessed against all the Units in accordance with the percentage of undivided interest in the Common Elements appurtenant to the Unit.

(b)    The Board of Directors shall have the power to assess specially pursuant to this Paragraph and to Section 44-3-80(b) of the Act as, in its discretion, it shall deem appropriate. Failure of the Board of Directors to exercise its authority under this Paragraph shall not be grounds for any action against the Association or the Board of Directors and shall not constitute a waiver of the Board's right to exercise its authority under this Paragraph in the future with respect to any expenses, including an expense for which the Board has not previously exercised its authority under this Paragraph.

(i)    Any Common Expenses benefiting less than all of the Units or significantly disproportionately benefiting all Units may be specially assessed equitably among all of the Units which are benefited according to the benefit received. Except for expenses for maintenance, repair, or replacement of Limited Common Elements which may be specially assessed, expenses

- 6 -

incurred for the maintenance, repair or replacement o the Area of Common Responsibility, shall not be specially assessed.

(ii)    Any Common Expenses occasioned by the conduct of less than all of those entitled to occupy all of the Units or by the Occupant(s), licensees or invitees of any such Unit or Units may be specially assessed against such Unit or Units.

10.    ASSOCIATION RIGHTS AND RESTRICTIONS.

In addition to and not in limitation of all other rights it may have, the Association, acting through its Board of Directors, shall have the right and authority:

(a)    to enter into Units for maintenance, emergency, security, or safety purposes, which right may be exercised by the Association's Board of Directors, officers, agents, employees, managers, and all police officers, firemen, ambulance personnel, and similar emergency personnel in the performance of their respective duties. Except in an emergency situation, entry shall be only during reasonable hours and after reasonable notice to the Owner or Occupant of the Unit. For the purposes of this section, a water or other utility leak, fire, strong foul odor, obvious insect infestation or sound indicating that a person or animal might be injured or sick and require immediate medical attention shall be considered emergencies justifying immediate entry into a Unit. The failure to exercise the rights herein or to exercise said rights in a timely manner shall not create liability to any of the above-referenced parties, it being agreed that no duty to enter a Unit shall exist;

(b)    to make and to enforce reasonable rules and regulations governing the use of the Condominium, including the Units, Limited Common Elements, and Common Elements;

(c)    to enforce use restrictions, other Declaration and Bylaws provisions, and rules and regulations by the imposition of reasonable monetary fines and suspension of use and voting privileges as provided in Section 44-3-76 of the Act, as amended;

(d)    to grant permits, licenses, utility easements, and other easements;

(e)    to control, manage, operate, maintain, improve and replace all portions of the Area of Common Responsibility;

(f)    to deal with the Condominium in the event of damage or destruction as a result of casualty loss, condemnation or eminent domain, in accordance with the provisions of the Act and this Declaration;

(g)    to acquire, hold, and dispose of tangible and intangible personal property and real property;

(h)    to establish a construction deposit in a reasonable amount determined by the Board of Directors to be paid by all Owners making modifications, alterations or additions to their Units in order to protect the Condominium against damage due to the transportation and use of construction materials in the Condominium. Costs for repair of such damage may be deductible from the construction deposit and any additional expenses may be specifically assessed against the Unit under 9(b)(ii) above; and

(i)    to close permanently or temporarily any portion of the Common Elements (excluding the Limited Common Elements, those portions of the Common Elements which provide access to the Units

BOOK 27055ñ187

and any portion of the Common Elements over, on, upon or which the Declarant or the Owner(s) of any Commercial Unit have an easement) with thirty (30) days prior notice to all Owners, except that, in emergency situations requiring a temporary closing, prior notice shall not be required so long as notice is given within three (3) days after the closing explaining the reason for the closing. Notwithstanding the above, the Owners may re-open closed Common Elements by a majority vote of the total Association vote, cast at a duly called special or annual meeting.

11.   **ASSESSMENTS.**

(a)   **Purpose of Assessment.** The Association shall have the power to levy assessments as provided herein and in the Act. The assessments for Common Expenses provided for herein shall be used for the general purposes of promoting the recreation, health, safety, welfare, common benefit, and enjoyment of the Owners and Occupants of Units in the Condominium as may be more specifically authorized from time to time by the Board.

(b)   **Creation of the Lien and Personal Obligation For Assessments.** Each Owner of any Unit, by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agree to pay to the Association: (i) annual assessments or charges; (ii) special assessments, such assessments to be established and collected as hereinafter provided; and (iii) specific assessments against any particular Unit which are established pursuant to the terms of this Declaration, including but not limited to reasonable fines imposed in accordance with the terms of this Declaration.

All such assessments, together with charges, interest, costs, and reasonable attorney's fees actually incurred, and if the Board so elects, rents, in the maximum amount permitted by the Act, shall be a charge on the Unit and shall be a continuing lien upon the Unit against which each assessment is made. Such amounts shall also be the personal obligation of the Person who was the Owner of such Unit at the time when the assessment fell due. Each Owner and his or her grantee shall be jointly and severally liable for all assessments and charges due and payable at the time of any conveyance.

Assessments shall be paid in such manner and on such dates as may be fixed by the Board of Directors; unless otherwise provided, the annual assessments shall be paid in equal monthly installments due on the first day of each calendar month. No Owner may exempt himself or herself from liability for or otherwise withhold payment of assessments for any reason whatsoever, including, but not limited to, nonuse of the Common Elements, the Association's failure to perform its obligations required hereunder, or inconvenience or discomfort arising from the Association's performance of its duties. The lien provided for herein shall have priority as provided in the Act.

(c)   **Delinquent Assessments.** All assessments and related charges not paid on or before the due date shall be delinquent, and the Owner shall be in default.

(i)   If any monthly installment of annual assessments or any part thereof is not paid in full by the tenth (10th) day of the month or if any other charge is not paid within ten (10) days of the due date, a late charge equal to the greater of ten ($10.00) dollars or ten (10%) percent of the amount not paid, or such higher amounts as may be authorized by the Act, may be imposed without further notice or warning to the delinquent Owner and interest at the rate of ten (10%) percent per annum or such higher rate as may be permitted by the Act shall accrue from the due date.

BOOK 27056 188

- 8 -

(ii)    If part payment of assessments and related charges is made, the amount received may be applied first to costs and attorney's fees, then to late charges, then to interest, then to delinquent assessments, and then to current assessments.

(iii)    If assessments, fines or other charges or any part thereof due from an Owner remain delinquent and unpaid for a period greater than fifteen (15) days from the date due, a notice of delinquency may be given to that Owner stating that if the assessment, fine or charge remains delinquent for more than ten (10) days from the date of the notice of delinquency, the Board of Directors may accelerate and declare immediately due all of that Owner's unpaid installments of the annual assessment and of any special assessment. If an Owner fails to pay all assessments and related charges currently due within ten (10) days of the date of the notice of delinquency, the Board of Directors may then accelerate and declare immediately due all installments of the annual assessment and of any special assessment, without any further notice being given to the delinquent Owner. Upon acceleration, that Owner shall thereby lose the privilege of paying the annual assessment in monthly installments for that fiscal year.

(iv)    If assessments and other charges or any part thereof remain unpaid more than thirty (30) days after the assessment payments first become delinquent, the Association, acting through the Board of Directors, may institute suit to collect all amounts due pursuant to the provisions of the Declaration, the Bylaws, the Act and Georgia law and suspend the Owner's and/or Occupant's right to vote and the right to use the Common Elements; provided, however, the Board may not limit ingress or egress. Enforcement under this subparagraph is not dependent upon or related to other restrictions and/or other actions.

(v)    If any assessment or other charge is delinquent for thirty (30) days or more, in addition to all other rights provided in the Act and herein, the Association shall have the right upon ten (10) days written notice, and in compliance with any requirements set forth in the Act, to suspend any utility or service, the cost of which are a Common Expense, including, but not limited to, water, electricity, heat, air conditioning and cable television, to that Unit until such time as the delinquent assessments and all costs permitted under this Paragraph, including reasonable attorney's fees, are paid in full. Any costs incurred by the Association in discontinuing and/or reconnecting any utility service, including reasonable attorney's fees, shall be an assessment against the Unit.

Notwithstanding the above, the Board only may suspend any utility or service paid for as a Common Expense after a final judgment or judgments in excess of a total of $750.00, or such other amount as required by the Act, are obtained in favor of the Association from a court of competent jurisdiction, the Association provides the notice required to be provided by the institutional provider of such service prior to suspension of such service, and the Association complies with any other requirements of Georgia law. A Unit Owner whose utility service has been suspended shall not be entitled to use any such services paid for as a Common Expense from any source and any such unauthorized use shall be considered a theft of services under O.C.G.A. §16-8-6. The utility services shall not be required to be restored until all judgments are paid in full, at which time the Association shall direct the utility provider to restore the service.

(d)    Computation of Operating Budget and Assessment.    It shall be the duty of the Board at least twenty-one (21) days prior to the beginning of the Association's fiscal year to prepare a budget covering the estimated costs of operating the Condominium during the coming year. The Board shall cause the budget and notice of the assessments to be levied against each Unit for the following year to be

BOOK 27056 169

delivered to each member at least thirty (30) days prior to the Association's annual meeting. The budget and the assessment shall become effective unless disapproved at a duly called and constituted annual meeting of the Association by a vote of a majority of the total Association vote; provided, however, if a quorum is not obtained at the annual meeting, the budget shall become effective even though a vote to disapprove the budget could not be called at this meeting.

Notwithstanding the foregoing, in the event that the membership disapproves the proposed budget or the Board fails for any reason so to determine the budget for the succeeding year, then and until such time as a budget shall have been determined as provided herein, the budget in effect for the current year shall continue for the succeeding year. In such case, the Board may propose a new budget at any time during the year at a special meeting of the Association. The proposed budget and assessment shall be delivered to the members at least thirty (30) days prior to the proposed effective date thereof and at least seven (7) days prior to the special meeting. The approval procedure set forth above for budgets considered at annual meetings shall also apply to budgets considered at special meetings.

Enforcement under this subparagraph is not dependent upon or related to other restrictions and/or other actions.

(e)    Special Assessments. In addition to the annual assessment provided for in subparagraph (b) above, the Board may, at any time, and in addition to any other rights it may have, levy a special assessment against all Owners, notice of which shall be sent to all Owners. Any special assessment (except as provided in Paragraph 9(b) regarding the power to assess specially pursuant to Section 44-3-80(b) of the Act and Paragraph 13(b) herein, regarding repair or reconstruction of casualty damage to or destruction of all or part of the Condominium) which would cause the average total of special assessments levied in one fiscal year to exceed two hundred ($200.00) dollars per Unit, shall be approved by a majority of the total Association vote prior to becoming effective.

(f)    Capital Budget and Contribution. The Board of Directors may annually prepare a capital budget which shall take into account the number and nature of replaceable assets, the expected life of each asset, and the expected repair or replacement cost. The Board may set the required capital contribution, if any, in an amount sufficient to permit meeting the projected capital needs of the Association, as shown on the capital budget, with respect both to amount and timing by equal annual assessments over the period of the budget. The capital contribution required, if any, shall be fixed by the Board and included within the budget and assessment as provided in subparagraph (d) of this Paragraph. A copy of the capital budget shall be distributed to each member in the same manner as the operating budget.

Notwithstanding any other provisions of this Declaration, during the time the Declarant appoints the directors and officers of the Association pursuant to Article III, Section 2 of the Bylaws, Declarant (i) may collect a non-refundable contribution to the capital fund of the Association from the initial purchaser of each Unit in the amount of two (2) months of the general assessments, and (ii) shall not be required to prepare a capital budget, set any other capital contribution, or otherwise collect amounts for capital reserves. Any capital contribution collected by the Declarant shall not be collected against a Mortgagee which takes title to a Unit pursuant to foreclosure.

(g)    Statement of Account. Any Owner, Mortgagee, or a Person having executed a contract for the purchase of a Unit, or a lender considering a loan to be secured by a Unit, shall be entitled, upon written request, to a statement from the Association setting forth the amount of assessments due and unpaid, including any late charges, interest, fines, or other charges against a Unit. The Association shall respond in writing within five (5) days of receipt of the request for a statement; provided, however, the Association may require the payment of a fee, not exceeding ten ($10.00) dollars, or such higher amount

- 10 -

as may be authorized by the Act, as a prerequisite to the issuance of such a statement. Such written statement shall be binding on the Association as to the amount of assessments due on the Unit as of the date specified therein.

(h)   Surplus Funds and Common Profits. Pursuant to Section 44-3-108 of the Act, common profits from whatever source shall be applied to the payment of Common Expenses. Any surplus funds remaining after the application of such common profits to the payment of Common Expenses shall, at the option of the Board of Directors, either be distributed to the Owners or credited to the next assessment chargeable to the Owners in proportion to the liability for Common Expenses attributable to each Unit, or added to the Association's reserve account.

12.   INSURANCE.

The Association shall obtain and maintain at all times, as a Common Expense, insurance as required by Section 44-3-107 of the Act, as amended, and as required herein. To the extent reasonably available at reasonable cost, the Association's insurance policy shall cover any of the following types of property contained within a Unit, regardless of ownership: (a) fixtures, improvements and alterations that are a part of the building or structure; and (b) appliances, such as those used for refrigerating, ventilating, cooking, dishwashing, laundering, security or housekeeping. If such insurance is not reasonably available, the Association's insurance policy may exclude improvements and betterments made by the Unit Owner and may exclude the finished surfaces of perimeter and partition walls, floors, and ceilings within the Units (i.e., paint, wallpaper, paneling, other wall covering, tile, carpet and any floor covering; provided, however, floor covering does not mean unfinished hardwood or unfinished parquet flooring).

All insurance purchased by the Association pursuant to this Paragraph shall run to the benefit of the Association, the Board of Directors, officers, all agents and employees of the Association, the Unit Owners, and their respective Mortgagees, and all other persons entitled to occupy any Unit, as their interests may appear. The Association's insurance policy may contain a reasonable deductible, and the amount thereof shall not be subtracted from the face amount of the policy in determining whether the insurance equals at least the replacement cost of the insured property.

The Board of Directors shall make available for review by Owners a copy of the Association's insurance policy to allow Owners to assess their personal insurance needs and each Owner shall have the right to obtain additional coverage at his or her own expense.

All insurance coverage for the Association shall be written in the name of the Association as trustee for itself, each of the Owners, and the Mortgagees of Owners, if any. It shall be the duty of the Board of Directors at least every two (2) years to conduct an insurance review to determine if the policy in force is adequate to meet the needs of the Association and to satisfy the requirements of Section 44-3-107 of the Act, as amended. Such responsibility may be performed, and shall be deemed reasonably performed, by the Board requesting the Association's insurance agent to verify that insurance policies in existence meet the needs of the Association and satisfy the requirements of Section 44-3-107 of the Act, as amended.

(a)   The Board of Directors shall utilize reasonable efforts to secure a blanket hazard insurance policy providing "all risk" coverage in an amount equal to full replacement cost, before application of deductibles, of all improvements located on the Condominium property. If "all risk" coverage is not reasonably available at reasonable cost, the Board shall obtain, at a minimum, fire and extended coverage, including coverage for vandalism and malicious mischief, in like amounts. The Board shall use reasonable efforts to obtain policies that will provide the following:

- 11 -

     (i)      the insurer waives its rights of subrogation of any claims against directors, officers, the managing agent, the individual Owners, Occupants, and their respective household members;

     (ii)     any "other insurance" clause contained in the master policy shall expressly exclude individual Unit Owners' policies from its operation;

     (iii)    until the expiration of thirty (30) days after the insurer gives notice in writing to the Mortgagee of any Unit, the Mortgagee's insurance coverage will not be affected or jeopardized by any act or conduct of the Owner of such Unit, the other Unit Owners, the Board of Directors, or any of their agents, employees, or household members, nor be canceled for nonpayment of premiums;

     (iv)    the master policy may not be canceled, substantially modified, or subjected to nonrenewal without at least thirty (30) days prior notice in writing to the Board of Directors and all Mortgagees of Units;

     (v)     an agreed value endorsement and an inflation guard endorsement; and

     (vi)    the deductible amount per occurrence for coverage required by the Act shall not exceed one thousand ($1,000.00) dollars.

    **(b)**    All policies of insurance shall be written with a company licensed to do business in the State of Georgia. The company shall provide insurance certificates to each Owner and each Mortgagee upon request.

    **(c)**    Exclusive authority to adjust losses under policies obtained by the Association shall be vested in the Association's Board of Directors; provided, however, no Mortgagee having an interest in such losses may be prohibited from participating in the settlement negotiations, if any, related thereto.

    **(d)**    In no event shall the insurance coverage obtained and maintained by the Association hereunder be brought into contribution with insurance purchased by individual Unit Owners or their Mortgagees. Each Unit Owner shall notify the Board of Directors of all structural improvements made by the Unit Owner to his or her Unit. Any Unit Owner who obtains an individual insurance policy covering any portion of the Condominium, other than improvements and betterments made by such Owner at his or her expense and personal property belonging to such Owner, shall file a copy of such individual policy or policies with the Board of Directors within thirty (30) days after the purchase of such insurance. Such Owner shall also promptly notify, in writing, the Board of Directors in the event such policy is canceled.

    **(e)**    In addition to the insurance required hereinabove, the Board shall obtain as a Common Expense:

     (i)     worker's compensation insurance if and to the extent necessary to meet the requirements of law;

     (ii)    public liability insurance in amounts no less than required by Section 44-3-107 of the Act, as amended, and officers' and directors' liability insurance in such amounts as the Board may determine. The public liability insurance shall contain a cross liability endorsement;

BOOK 27058 PG 192

(iii)    fidelity bonds, if reasonably available, covering officers, directors, employees, and other persons who handle or are responsible for handling Association funds. Such bonds, if reasonably available, shall be in an amount consonant with the best business judgment of the Board of Directors, but in no event less than three (3) month's assessments plus a reasonable amount to cover all or a reasonable portion of reserve funds in the custody of the Association at any time during the term of the bond; provided, however, fidelity coverage herein required may be reduced based on the implementation of financial controls which take one or more of the following forms: (a) the Association or management company, if any, maintains a separate bank account for the working account and the reserve account, each with appropriate access controls and the bank in which funds are deposited sends copies of the monthly bank statements directly to the Association; (b) the management company, if any, maintains separate records and bank accounts for each association that uses its services and the management company does not have the authority to draw checks on, or to transfer funds from, the Association's reserve account; or (c) two members of the Board of Directors must sign any checks written on the reserve account; and

(iv)    such other insurance as the Board of Directors may determine to be necessary.

(f)    Insurance carried by the Association as a Common Expense shall not be required to include any part of a Unit which is not depicted on the original plats and plans or included in the original mortgage, nor shall the Association include public liability insurance for individual Owners for liability arising within the Unit.

(g)    Nothing contained herein gives any Owner or other party a priority over any rights of first Mortgagees as to distribution of insurance proceeds. Any insurance proceeds payable to the Owner of a Unit on which there is a Mortgagee endorsement shall be disbursed jointly to such Unit Owner and the Mortgagee. This is a covenant for the benefit of any such Mortgagee and may be enforced by any such Mortgagee.

(h)    Every Unit Owner shall be obligated to obtain and maintain at all times insurance covering those portions of his or her Unit to the extent not insured by policies maintained by the Association. Upon request by the Board, the Unit Owner shall furnish a copy of such insurance policy or policies to the Association. In the event that any such Unit Owner fails to obtain insurance as required by this subparagraph, the Association may purchase such insurance on behalf of the Unit Owner and assess the cost thereof to the Unit Owner, to be collected in the manner provided for collection of assessments under Paragraph 11 hereof.

(i)    Insurance Deductibles. In the event of an insured loss, any required deductible shall be considered a maintenance expense to be paid by the person or persons who would be responsible for such loss in the absence of insurance. If the loss affects more than one Unit or a Unit and the Common Elements, the cost of the deductible may be apportioned equitably by the Board among the parties suffering loss in proportion to each affected owner's portion of the total cost of repair. Notwithstanding this, if the insurance policy provides that the deductible will apply to each Unit separately or to each occurrence, each Unit Owner shall be responsible for paying the deductible pertaining to his or her Unit, if any. If any Owner or Owners fail to pay the deductible when required under this subparagraph, then the Association may pay the deductible and assess the cost to the Owner or Owners pursuant to Paragraph 9 of this Declaration; provided, however, where the deductible is for insurance required under the Act, no Owner shall be assigned more than one thousand ($1,000.00) dollars, or such higher amount as authorized by the Act, as the cost of the deductible for any one occurrence.

BOOK 27056M193



13.    REPAIR AND RECONSTRUCTION.

In the event of damage to or destruction of all or any part of the Condominium as a result of fire or other casualty, unless eighty (80%) percent of the Unit Owners, including the Owner or Owners of any damaged Unit or Units, vote not to proceed with the reconstruction and repair of the structure, the Board of Directors or its duly authorized agent shall arrange for and supervise the prompt repair and restoration of the structure. In the event of substantial damage or destruction, each institutional holder of a first Mortgage shall be entitled to written notice of the damage, and nothing in these documents shall be construed to afford a priority to any Unit Owner with respect to the distribution of proceeds to any such Unit.

(a)    Cost Estimates.    Immediately after a fire or other casualty causing damage to the Condominium, the Board of Directors shall obtain reliable and detailed estimates of the cost of repairing and restoring the structures (including any damaged Unit) to substantially the condition which existed before such casualty, allowing for any changes or improvements necessitated by changes in applicable building codes. Such costs may also include professional fees and premiums for such bonds as the Board of Directors determines to be necessary.

(b)    Source and Allocation of Proceeds.    If the proceeds of insurance are not sufficient to defray the estimated costs of reconstruction and repair, as determined by the Board of Directors, or if at any time during the reconstruction and repair or upon completion of reconstruction and repair the funds for the payment of the costs thereof are insufficient, the additional costs shall be assessed against the Owners of the Unit(s) damaged in proportion to the damage to the Units or against all Owners, in the case of insufficient funds to cover damage to the Common Elements. This assessment shall not be considered a special assessment as discussed in Paragraph 11(e). If after repair and reconstruction is completed there is a surplus of funds, such funds shall be common funds of the Association to be used as directed by the Board of Directors.

(c)    Plans and Specifications.    Any such reconstruction or repair shall be substantially in accordance with the plans and specifications under which the Condominium was originally constructed, except where changes are necessary to comply with current applicable building codes or where improvements not in accordance with the original plans and specifications are approved by the Board of Directors. To the extent insurance proceeds are available, the Association may reconstruct or repair Owner improvements damaged as a result of fire or other casualty.

(d)    Encroachments.    Encroachments upon or in favor of Units which may be created as a result of such reconstruction or repair shall not constitute a claim or basis for any proceeding or action by the Unit Owner upon whose property such encroachment exists, provided that such reconstruction was substantially in accordance with the architectural plans under which the Condominium was originally constructed. Such encroachments shall be allowed to continue in existence for so long as the reconstructed building shall stand.

(e)    Construction Fund.    The net proceeds of the insurance collected on account of a casualty and the funds collected by the Association from assessments against Unit Owners on account of such casualty shall constitute a construction fund which shall be disbursed in payment of the cost of reconstruction and repair in the manner set forth in this Paragraph to be disbursed by the Association in appropriate progress payments to such contractor(s), supplier(s), and personnel performing the work or supplying materials or services for the repair and reconstruction of the buildings as are designated by the Board of Directors.

BOOK 27055 PAGE 194

14.    ARCHITECTURAL CONTROLS.

(a)    During Declarant Control.    During the time in which the Declarant has the right to appoint directors and officers of the Association under Article III, Section 2 of the Bylaws there shall be no Architectural Control Committee and all encroachments onto the Common Elements or Limited Common Elements, exterior change, alteration or construction (including painting and landscaping), and any erection, placement or posting of any object, sign, clothesline, speaker, playground equipment, light, fountain, flag, or thing on the exterior or roof of the building, in any windows (except window treatments as provided herein), or on any Limited Common Elements or any Common Elements, must receive the prior written approval of the Declarant; except that reasonable seasonal decorative lights may be displayed between Thanksgiving and January 15th and a mezuzah not more than nine (9") inches in height and three (3") inches in width may be posted on the door frame of the Unit. However, under no circumstances shall enclosures of balconies be permitted. Granting or withholding such approval shall be within the sole discretion of the Declarant. All references below to the Architectural Control Committee or ACC shall refer to the Declarant during the period of Declarant control of the Association.

(b)    After Declarant Control.    After such time as the Declarant's rights to appoint officers and directors of the Association as provided in Article III, Section 2 of the Bylaws has expired, an Architectural Control Committee shall be appointed by the Board of Directors and except for the Declarant, no Owner, Occupant, or any other person may make any encroachment onto the Common Elements or Limited Common Elements, nor erect, place or post any object, sign, clothesline, speakers, playground equipment, light, fountains, flags, or thing on the exterior or roof of the buildings, in any windows (except window treatments as provided herein), on any Limited Common Elements, or on any other Common Elements, without first obtaining the written approval of the ACC; except that reasonable seasonal decorative lights may be displayed between Thanksgiving and January 15th and a mezuzah not more than nine (9") inches in height and three (3") inches in width may be posted on the door frame of the Unit. The standard for approval of such improvements shall include, but not be limited to, aesthetic consideration, materials to be used, harmony with the external design of the existing buildings, Units and structures, and the location in relation to surrounding structures and topography. Notwithstanding the above, Declarant shall not be required to obtain any approvals under this Paragraph.

(c)    Alterations and Storage Within Units.    No Owner or Occupant may make any alteration within a Unit which involves connecting to Common Element pipes, lines, conduits and/or other apparatus for access to common utilities without prior written ACC approval (including, but not limited to installation of washers and dryers). No Owner or Occupant shall make any interior modifications to or place an excessive load on any structural or load bearing portions of a Unit without first obtaining the prior written approval of the ACC. Such approval shall not be granted by the ACC unless the Owner has presented to the ACC a report or drawing prepared by a licensed structural engineer showing that compensating measures will be taken to ensure the structural integrity of the Unit and the Condominium. All building code requirements must be complied with and necessary permits and approvals secured for any modifications. Notwithstanding the above, Declarant shall not be required to obtain any approvals under this paragraph.

(d)    Applications.    Applications for approval of any such architectural modification shall be in writing and shall provide such information as the ACC may reasonably require. The ACC shall be the sole arbiter of such application and may withhold approval for any reason, including purely aesthetic considerations, and it shall be entitled to stop any construction which is not in conformance with approved plans. The ACC may publish written architectural standards for exterior and Common Element alterations or additions, and any request in substantial compliance therewith shall be approved; provided,

- 15 -

however, each such requested change shall be in harmony with the external design of the existing buildings and Units and the location in relation to surrounding structures and topography of the vicinity.

In the event that the ACC fails to approve or to disapprove such application within forty-five (45) days after the application and all information as the ACC may reasonably require have been submitted, its approval will not be required and this subparagraph will be deemed complied with; provided, however, even if the requirements of this subparagraph are satisfied, nothing herein shall authorize anyone to construct or maintain any structure or improvement that is otherwise in violation of the Declaration, the Bylaws, or the rules and regulations.

(e)    Encroachments onto Common Elements and Limited Common Elements.    The ACC subject to this subparagraph may allow encroachments onto the Common Elements and Limited Common Elements as it deems acceptable.

(f)    Condition of Approval.    As a condition of approval for a requested architectural change, modification, addition, or alteration, an Owner, on behalf of himself or herself and his or her successors-in-interest, shall assume all responsibilities for maintenance, repair, replacement and insurance of such change, modification, addition, or alteration, unless otherwise agreed to in writing by the ACC. It is the responsibility of every Owner of a condominium Unit to determine for himself or herself what architectural modifications have been made to his or her Unit by any predecessor-in-interest. In the discretion of the ACC, an Owner may be made to verify such condition of approval by written instrument in recordable form acknowledged by such Owner on behalf of himself or herself and all successors-in-interest.

(g)    Limitation of Liability.    Review and approval of any application pursuant to this Paragraph is made on the basis of aesthetic considerations only, and neither the Declarant, the Board of Directors or the ACC shall bear any responsibility for ensuring the structural integrity or soundness of approved construction or modifications, or for ensuring compliance with building codes and other governmental requirements. Neither the Declarant, the Association, the Board of Directors, the ACC, or member of any of the foregoing shall be held liable for any injury, damages or loss arising out of the manner or quality of approved construction on or modifications to any Unit.

(h)    No Waiver of Future Approvals.    Each Owner acknowledges that the members of the Board of Directors and ACC will change from time to time and that interpretation, application and enforcement of the architectural standards may vary accordingly. Each Owner further acknowledges that the ACC may adopt different architectural standards for different parts of the condominium, based on street visibility and location of the proposed modification in the building. The approval of either the Board of Directors or the ACC of any proposals, plans and specifications or drawings for any work done or proposed, or in connection with any other matter requiring the approval and consent of the Board of Directors, or the ACC shall not be deemed to constitute a waiver of any right to withhold approval or consent as to any similar proposals, plans and specifications, drawings, or matters whatever subsequently or additionally submitted for approval or consent.

(i)    Enforcement.    Any construction, alteration, or other work done in violation of this Paragraph shall be deemed to be nonconforming. Upon written request from the Board or the ACC, Owners shall, at their own cost and expense, remove such construction, alteration, or other work and shall restore the property to substantially the same condition as existed prior to the construction, alteration, or other work. Should an Owner fail to remove and restore as required hereunder, the Board or its designees shall have the right to enter the property, remove the violation and restore the property to substantially the same condition as existed prior to the construction, alteration or other work. All costs

BOOK 27030 196

thereof, including reasonable attorney's fees, may be assessed against the benefited Unit and collected as an assessment pursuant to this Declaration.

In addition to the foregoing, the Board of Directors shall have the authority and standing, on behalf of the Association, to impose reasonable fines and to pursue all legal and equitable remedies available to enforce the provisions of this Paragraph and its decisions. Furthermore, the Board shall have the authority to record in the Fulton County land records notices of violation of the provisions of this Paragraph.

If any Owner or Occupant makes any exterior change, alteration, or construction (including landscaping) upon the Common Elements or Limited Common Elements in violation of this Paragraph, he or she does so at his or her sole risk and expense. The Board may require that the change, alteration or construction remain on the Common Elements or Limited Common Elements without reimbursement to the Owner or Occupant for any expense he or she may have incurred in making the change, alteration or construction.

(j)    Commencement of Construction.   All architectural changes, modifications and improvements approved by the ACC hereunder must be commenced within one (1) year from the date of approval.  If not commenced within one (1) year from the date of such approval, then such approval shall be deemed revoked by the ACC, unless the ACC gives a written extension for commencing the work.  All work approved by the ACC hereunder shall be completed in its entirety within ninety (90) days from the date of commencement, unless otherwise agreed in writing by the ACC.  All approved architectural changes, modifications, and improvements must be completed in their entirety, an Owner may not construct only a portion or part of an approved architectural change, modification, or improvement.

## 15.    USE RESTRICTIONS.

Each Owner of a Unit shall be responsible for ensuring that the Owner's family, guests, tenants and Occupants comply with all provisions of the Condominium Instruments and the rules and regulations of the Association.  Furthermore, each Owner and Occupant shall always endeavor to observe and promote the cooperative purposes for which the Association was established. In addition to any rights the Association may have against the Owner's family, guests, tenants or Occupants, as a result of such person's violation of the Condominium Instruments, the Association may take action under this Declaration against the Owner as if the Owner committed the violation in conjunction with the Owner's family, guests, tenants or Occupants.

In addition to the following use restrictions, the Board of Directors may adopt rules and regulations in accordance with the terms hereof and as specified in the Bylaws.

(a)    Use of Units.

(i)    Residential Units.  Each Residential Unit shall be used for residential purposes only, and no trade or business of any kind may be conducted in or from a Residential Unit or any part of the Condominium, except that the Owner or Occupant residing in a Residential Unit may conduct ancillary business activities within the Residential Unit so long as:

(A)    the existence or operation of the business activity is not apparent or detectable by sight, sound, or smell from outside of the Residential Unit;

(B)    the business activity does not involve visitation of the Residential Unit by employees, clients, customers, suppliers or other business invitees in greater volume than

- 17 -